**THE ROSEN LAW FIRM, P.A.**
Laurence Rosen, Esq.
One Gateway Center, Suite 2600
Newark, NJ  07102
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| DAVID RIGO FERNANDEZ, Individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>    v.<br><br>DOUYU INTERNATIONAL HOLDINGS LIMITED, SHAOJIE CHEN, and MINGMING SU,<br><br>    Defendants. | **Case No:**<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>JURY TRIAL DEMANDED</u> |

Plaintiff David Rigo Fernandez ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, and announcements made by Defendants, public filings, wire and press releases published by and regarding DouYu International Holdings Limited ("DouYu" or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded DouYu securities between April 30, 2021 and May 9, 2023, inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

5.      In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.     Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased DouYu securities during the Class Period and was economically damaged thereby.

7.     DouYu purports to be "a leading game-centric live streaming platform in China and a pioneer in the eSports value chain. DouYu operates its platform on both PC and mobile apps to bring users access to immersive and interactive games and entertainment livestreaming, a wide array of video and graphic contents, as well as opportunities to participate in community events and discussions. By nurturing a sustainable technology-based talent development system and relentlessly producing high-quality content, DouYu consistently delivers premium content through integration of livestreaming, video, graphics, and virtual communities with a primary focus on games, especially on eSports. This enables DouYu to continuously expand its user base and enhance its user experience."

8.     The Company is incorporated in the Cayman Islands and has its principal place of business in the People's Republic of China ("China"). DouYu's American Depositary Shares ("ADS" or "ADSs") trade on the NASDAQ exchange under the ticker symbol "DOYU".

9.     Defendant Shaojie Chen ("Chen") founded the Company and has served as its Chief Executive Officer and Director since May 2014.

10.     Defendant Mingming Su ("Su") has served as the Company's Chief Strategy Officer since November, 2015, a Director since October 2016, and the Company's principal financial officer throughout the Class Period.

11.     Defendants Chen and Su are collectively referred to herein as the "Individual Defendants."

12.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)    approved or ratified these statements in violation of the federal

securities laws.

13.    The Company is liable for the acts of the Individual Defendants and its

employees under the doctrine of *respondeat superior* and common law principles

of agency because all of the wrongful acts complained of herein were carried out

within the scope of their employment.

14.    The scienter of the Individual Defendants and other employees and

agents of the Company is similarly imputed to the Company under *respondeat*

*superior* and agency principles.

15.    The Company and the Individual Defendants are collectively referred

to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

16.    The Class Period begins on April 30, 2021, when the Company filed

with the SEC its Annual Report on Form 20-F for the year ended December 31, 2020

(the "2020 Annual Report"). Attached to the 2020 Annual Report were signed

certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by

Defendants Chen and Su attesting to the accuracy of financial reporting, the

disclosure of any material changes to the Company's internal controls over financial

reporting, and the disclosure of all fraud.

17.    While the 2020 Annual Report discussed regulatory requirements as

6

they related to content moderation, as well as the content moderation practices it used in order to comply with the applicable Chinese laws, it did not sufficiently disclose the substantial difficulties it faced if the Chinese government were to more aggressively enforce existing content moderation laws (regardless of the Company's attempts to comply). Further, it did not sufficiently disclose its risk if there were to be new laws affecting live-streaming companies given government concern with issues such as video game addiction.

18.    Then, on April 29, 2022, the Company filed with the SEC its Annual Report on Form 20-F for the year ended December 31, 2021 (the "2021 Annual Report"). Attached to the 2021 Annual Report were signed certifications pursuant to SOX signed by Defendants Chen and Su attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

19.    The 2021 Annual Report disclosed ongoing changes to Chinese law relating to content moderation. The 2021 Annual Report also contained the following risk disclosure relating to content moderation:

> ***We are a game-centric livestreaming platform that provides real-time streaming and interactions***. Because we do not have full control over how streamers or viewers will use our platform to communicate, ***our platform may be misused by individuals or groups of individuals to engage in immoral, disrespectful, fraudulent or illegal activities***. ***For example, we must detect spam accounts, through which illegal or inappropriate content is streamed or posted and illegal or fraudulent activities are conducted, on a timely basis***. Media reports and Internet ***forums have covered some of these***

*incidents which have, in some cases, generated negative publicity about our platform and brand.* We have implemented control procedures to detect and block illegal or inappropriate content and illegal or fraudulent activities conducted through the misuse of our platform, but such procedures may not prevent all such content from being broadcasted or posted or activities from being carried out. Moreover, as we have limited control over real-time and offline behavior of our users, to the extent such behavior is associated with our platform, our ability to protect our brand image and reputation may be limited. Our business and the public perception of our brand may be materially and adversely affected by misuse of our platform.

(Emphasis added).

20.     This risk disclosure was materially false and misleading because it did not disclose that the Chinese government, due to concerns about issues such as video game addiction, could bring regulatory actions against it regardless of how effective its moderation practices were (or otherwise make it more difficult for DouYu to conduct business).

21.     Then, on April 25, 2023, the Company filed with the SEC its Annual Report on Form 20-F for the year ended December 31, 2022 (the "2022 Annual Report"). Attached to the 2022 Annual Report were signed certifications pursuant to SOX signed by Defendants Chen and Su attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

22.     The 2022 Annual Report contained the following risk disclosure regarding content moderation:

We are a game-centric livestreaming platform that provides real-time

streaming and interactions. Because we do not have full control over how streamers or viewers will use our platform to communicate, our platform may be misused by individuals or groups of individuals to engage in immoral, disrespectful, fraudulent or illegal activities. For example, we must detect spam accounts, through which illegal or inappropriate content is streamed or posted and illegal or fraudulent activities are conducted, on a timely basis. Media reports and Internet forums have covered some of these incidents which have, in some cases, generated negative publicity about our platform and brand. We have implemented control procedures to detect and block illegal or inappropriate content and illegal or fraudulent activities conducted through the misuse of our platform, but such procedures may not prevent all such content from being broadcasted or posted or activities from being carried out. Moreover, as we have limited control over real-time and offline behavior of our users, to the extent such behavior is associated with our platform, our ability to protect our brand image and reputation may be limited. Our business and the public perception of our brand may be materially and adversely affected by misuse of our platform.

In addition, if any of our viewers suffers or alleges to have suffered physical, financial or emotional harm following contact initiated on our platform or after watching or hearing illegal or inappropriate content that our content monitoring system failed to filter out, we may face civil lawsuits or other liabilities initiated by the affected viewer, or governmental or regulatory actions against us. In response to allegations of illegal or inappropriate activities conducted through our platform or any negative media coverage about us, PRC government authorities may intervene and hold us liable for noncompliance with PRC laws and regulations concerning the dissemination of information on the Internet and subject us to administrative penalties or other sanctions, such as requiring us to restrict or discontinue some of the features and services provided on our website and mobile application, or even revoke our licenses or permits to provide Internet content service. We endeavor to ensure that all streamers are in compliance with relevant regulations, but we cannot guarantee that all streamers will comply with all the PRC laws and regulations in all aspects. Therefore, our livestreaming service may be subject to investigations or subsequent penalties if content displayed on our platform is deemed to be illegal or inappropriate under PRC laws and regulations. Especially, if our top streamers violate the policy of our platform to conduct any illegal or inappropriate behavior on our platform or in private, we may be required to block the account of such top streamers. As a result, our business may suffer and our user base, revenues and profitability

may be materially and adversely affected.

23.    This risk disclosure was materially false and misleading because it did not disclose that the Chinese government, due to concerns about issues such as video game addiction, could bring regulatory actions against DouYu regardless of how effective its moderation practices were (or otherwise make it more difficult for DouYu to conduct business).

24.    This was materially false and misleading because, by the time the 2022 Annual Report was filed with the SEC, the Company was already under investigation by the CyberSpace Administration of China (the "CAC") due to allegedly inappropriate content being on the DouYu platform.

25.    The statements contained in ¶¶ 18-26 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) The Chinese government, due to concerns about issues such as video game and computer addiction, as well as content challenging its authority, could become increasingly aggressive towards DouYu regardless of how effective or sincere its attempts to comply with Chinese law were; (2) This increasingly aggressive posture subjected DouYu to a heightened risk of an investigation and subsequent government

enforcement action and ultimately resulted in enforcement action; and (3); as a result, Defendants' statements about its business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## THE TRUTH BEGINS TO EMERGE

26.     On March 29, 2022, after market hours, *The Wall Street Journal* released an article entitled "China Plans New Restrictions in Its Booming Live-Streaming Sector", which warned of coming regulatory hurdles faced by DouYu and others. The article stated, in pertinent part, the following:

> "***China is planning new curbs on the country's $30 billion live-streaming industry, according to people familiar with the matter, renewing a regulatory campaign aimed at reining in technology companies and exerting greater influence over the content consumed by its young people***.
>
> Chinese authorities are drafting new regulations to cap internet users' daily monetary spending on digital tipping, said people familiar with the situation. Officials are also planning to set a daily limit on how much live-streamers can receive from fans and are considering imposing tighter censorship over content, some of the people said.
>
> China's main internet regulator, the Cyberspace Administration of China, didn't respond to requests for comment.
>
> Live-streaming apps, which showcase user-generated content from influencers and ordinary people on a range of topics including gaming, music, food and shopping, have exploded in popularity in China in recent years, as the number of mobile internet users in China soars and demand for fresh content grows. The China Association of Performing Arts valued the country's live-streaming industry at the equivalent of about $30 billion in 2020.

       \*     \*     \*

Any attempts to regulate this booming segment of the online world *would follow in the footsteps of other efforts to clamp down and clean up behavior on the internet, particularly for younger people*.

In the past year, China has cracked down on for-profit education providers, *railed against the evils of what it described as a culture of celebrity worship and set strict limits on the amount of time minors can spend playing computer games*.

       \*     \*     \*

Internet regulators and China's Ministry of Culture began to gather feedback on the proposed new live-streaming rules from industry players and experts late last year, according to the people familiar with the matter, *who described the goal of the regulations as combating fraud, mobile-phone addiction and unhealthy online spending*.

One of the people said authorities were discussing a daily limit of 10,000 yuan, equivalent to about $1,570, on the amount of gifts that live-streaming hosts can accept. Chinese regulators worry that young people, drawn by the promise of lucrative earnings, would otherwise aspire to become live-streaming celebrities, the person said, adding that this was counter to the values that officials hoped to instill.

Another person familiar with the matter said the specific measures themselves are still under consideration, with the final decision resting with [Vice Premier Liu He]

*Beijing has grown concerned about the rapid and relatively unregulated growth of the live-streaming sector, which frequently features sexualized content and has generated complaints of fraud and deceptive behavior*.

Earlier this month, state broadcaster China Central Television singled out for criticism the practice of companies showcasing younger female live-streamers in a bid to solicit expensive gifts from male viewers. [. . .]

(Emphasis added).

27.    On this news, the price of DouYu ADSs declined $0.15 per ADS, or

6.35%, to close at $2.21 on March 30, 2022.

28.     On April 26, 2022, during market hours, an article entitled DouYu Facing The Tightening Noose of Regulations was posted on Seeking Alpha, a market oriented website, which warned about steps the Chinese government was taking due to societal fears surrounding video game addition, among other issues. It stated, in pertinent part:

"Following the 2016 boom, the government had put in place several restrictive regulations, which resulted in a washout. As a result, the market has consolidated to a significant degree, leaving a few players in each of the four segments represented above [Entertainment, Gaming, Short Video, and E-Commerce]. This potential was perceived optimistically throughout 2020, with COVID-related restrictions promising to bring a surge in demand for streaming services.

Although perceived as highly promising, with a market of the world's largest gaming population, *the Chinese e-game market has been suffering as a result of widespread government regulations in the form of a crackdown, in mid-2021. The move coincided with the Chinese government's so-called 'social intervention' it had undertaken to tackle the growing addiction to video games among minors in the country*.[. . .]

*                *                *

These circumstances add to the red flags surrounding DOYU and reinforce why investors must sell this stock, which is undergoing a downward spiral not expected to slow down. *In addition to the regulatory hurdles it faces, which are delivering a clear blow to its financial performance, the company is likely to simultaneously struggle against a worsening macroeconomic crisis*.

*DOYU is a stock that holds several red flags, as a result of external circumstances. With the regulatory crackdown on the Chinese gaming industry by authorities, as well as a state intervention to prevent a merger*, *the stock is increasingly struggling to create value for its shareholders*. This is evident in its deteriorating profit trend, despite increasing revenues. Moreover, the stock holds a risky profile which suggests overvaluation, in comparison to similarly-sized Chinese tech stocks. The recent macroeconomic COVID-related challenges that have brought a Chinese

equity market crash, and a worsening Yuan, are a further red flag for investors considering DOYU for their portfolios. ***This stock is a sell, as there is no current indication as to when the broader environment would deliver favorable conditions for DOYU to thrive in***.

(Emphasis added).

29.    On this news, the price of DouYu ADSs declined $0.11 per ADS, or 6.74%, to close at $1.52 per ADS on April 26, 2022.

30.    On February 27, 2023, after the American markets closed, the CAC released a statement on its website entitled "[t]he Central Cyberspace Administration of China carefully organizes the work of "anti-pornography and anti-illegal activities" on the Internet to promote the formation of a good network ecology. This statement stated, in pertinent part:

> Since 2022, the Central Cyberspace Affairs Commission has closely focused on meeting service guarantees and learning and publicizing the implementation of the Party's 20 major themes. Under the unified deployment of the national "anti-pornography and anti-illegal" working group, it has focused on outstanding situations that are highly concerned by netizens and strongly reflected by the masses. Combined with the launch of the "Qinglang" series of special actions, carefully organize and deeply promote the work of "anti-pornography and anti-illegal activities" on the Internet, strengthen comprehensive governance, increase law enforcement efforts, and suppress the responsibilities of all parties, and thoroughly rectify various online pornography-related and non-legal issues, creating a clearer environment. of cyberspace. According to statistics, in 2022, the national network information system will clean up more than 54.3 million pieces of illegal and bad information, remove 420 mobile applications, and cooperate with the telecommunications authorities to cancel the license or record of illegal websites, and close more than 25,000 illegal websites.
>
> **Comprehensively rectify online pornography and non-related issues, and actively create a good network environment.** Internet information

14

departments at all levels focus on key positions such as the first screen of the homepage of the website platform, hot search lists, hot topics, PUSH pop-up windows, and important news information content pages, and promptly clean up obscenity, vulgarity, bloody violence, horror, and other illegal and Harmful information, strictly deal with a group of website platforms engaged in pornography and gambling transactions. In view of the outstanding problems that have existed for a long time in the field of webcasting and short video, focus on cracking down on illegal information content such as "sexuality, ugliness, weirdness, fakeness, vulgarity, gambling" and other illegal information content, and strictly rectify dysfunctional, "net celebrity chaos", tipping, etc. Loss of degree, illegal profits, malicious marketing and other problems. ***For platforms such as Douyin, Kuaishou, Bilibili, Huajiao, Douyu, Huya and other platforms that have harmful and harmful information such as spreading pornographic drainage, vulgarity, violent abuse, and inducing rewards, interviews, rectification within a deadline, and strict enforcement Deal with relevant responsible persons, fines and other punishments***; 106 live broadcast and short video platforms, such as Putaomei Live, Xueyue Live, and Mengguo Live, which collect and disseminate obscene, pornographic, gambling and other illegal information, will be shut down according to law. Include its business entities in the blacklist of application developers.

**In-depth governance of the online environment for minors, effectively protecting the rights and interests of minors online**. Internet information departments at all levels should earnestly enhance their sense of responsibility and mission, strengthen the guidance, education, and protection of minors, carefully sort out the website platform applications commonly used by minors, thoroughly investigate the functions of each link of the product, adhere to comprehensive policies, and govern according to law, and effectively build a solid foundation security barrier. During the winter and summer vacations, the Central Cyberspace Affairs Office, together with the State Council's Unprotected Office, the Ministry of Education, the Central Committee of the Communist Youth League, and the All-China Women's Federation, jointly launched a special campaign to rectify the Internet environment for minors, strictly controlling the Internet that endangers the physical and mental health of minors and induces minors crimes, inducing minors to become addicted, etc. Concentrate on cleaning up harmful content involving minors such as "soft pornography", cult videos, suicide appointments, and the underworld in Zuan. "Red Children" for profit. Urge the website platform to further improve the youth model, strictly limit

the time limit and function, optimize the content recommended by the algorithm, and effectively prevent minors from "krypton gold" rewards, so that minors can feel more at ease online and parents can feel more at ease. Strengthen the information content management of smart watches, tablet computers and other devices specially used by minors, conduct in-depth investigations of voice, video, text, pictures, games and other scenarios, comprehensively clean up illegal and bad information, and fully implement the principles that are most beneficial to minors. The orientation is implemented in all aspects of the use of the Internet by minors.

**Continuously consolidate the foundation of the network management and governance system, and effectively consolidate the responsibility of the website platform**. The Central Cyberspace Administration formulated and revised regulations such as the Regulations on the Management of Internet User Account Information, the Regulations on the Management of Deep Synthesis of Internet Information Services, the Regulations on the Management of Mobile Internet Application Information Services, and the Opinions on Further Regulating the Profit-seeking Behavior of Online Live Streaming and Promoting the Healthy Development of the Industry. Policies, detailing and formulating operable and implementable norms and rules by field, link, and scenario, and continuously improving the Internet management system. Promote the gradual transformation of all website platforms from "I want to manage" to "I want to manage", further enhance the awareness of main responsibility, continuously improve management rules, strengthen information identification, optimize algorithm model parameters, actively clean up illegal and harmful information, and deal with illegal and illegal accounts. Better safeguard the legitimate rights and interests of netizens. Guiding and supervising websites in various places to standardize reporting work, further smoothing reporting channels, and more than 4,100 major websites across the country announced to the public how to accept reports. In 2022, the majority of netizens will report 172 million pieces of illegal and harmful information such as pornography, gambling, infringement, rumors, etc., actively participate in the comprehensive governance of the Internet, and jointly maintain a clean and clear cyberspace. In the next step, the Central Cyberspace Affairs Office will conscientiously implement the goal and task of "improving the comprehensive network governance system and promoting the formation of a good network ecology" proposed by the 20th National Congress of the Communist Party of China. ***In order to solve the problem, we will continue to increase the crackdown on violations of laws and regulations, continue to do a good job in the work***

*of "sweeping pornographic and illegal activities" online, and effectively safeguard the people's online cultural rights and interests*.

In the next step, the Central Cyberspace Affairs Office will conscientiously implement the goal and task of "improving the comprehensive network governance system and promoting the formation of a good network ecology" proposed by the 20th National Congress of the Communist Party of China. *In order to solve the problem, we will continue to increase the crackdown on violations of laws and regulations, continue to do a good job in the work of "sweeping pornographic and illegal activities" online, and effectively safeguard the people's online cultural rights and interests*.

(Emphasis added).

31.     On this news, the price of DouYu ADS declined by $0.07 per ADS, or 5.3%, to close at $1.25 on February 28, 2023.

32.     Then, on May 8, 2023, after the American markets closed, the CAC released a statement on its website entitled "The working group of the cyberspace department entered the Douyu platform." This release stated, in full, "[i]in response to serious ecological problems such as pornography and vulgarity on the Douyu platform, on May 8, the State Internet Information Office instructed the Hubei Provincial Internet Information Office to send a working group to the Douyu platform to carry out a one-month centralized rectification supervision."

33.     On May 9, 2023, before the market opened, the Company filed a current report on Form 6-K with the SEC, which contained a press release. This press release stated, in pertinent part, that the "CAC has sent an inspection team to the Company due to certain alleged violations of content rules and regulations on

17

its platform. The CAC team is expected to conduct a one-month on-site inspection of the Company's content platform, which DouYu will fully cooperate with. DouYu is also concurrently conducting a comprehensive internal review of its content monitoring system. As a platform committed to regulatory compliance and the safety of its user community, DouYu plans to implement all necessary remedial measures based on the CAC inspection and its own internal review. DouYu is expected to maintain its normal operations during this period of time."

34.     On this news, the Company's share price fell $0.098 per ADR, or 9.33%, on May 9, 2023.

35.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

36.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired DouYu securities publicly traded on the NASDAQ during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families and their legal representatives,

heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

37.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, DouYu securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

38.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

39.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

40.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of the Company;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused the Company to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of DouYu securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

41.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it

impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

42. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- DouYu securities met the requirements for listing, and were listed and actively traded on the NASDAQ, an efficient market;

- As a public issuer, the Company filed public reports;

- the Company communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period; and

- the Company was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

43. Based on the foregoing, the market for the Company securities promptly digested current information regarding the Company from all publicly

available sources and reflected such information in the prices of the common units, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

44.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## COUNT I
### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder Against All Defendants

45.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

46.     This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

47.      During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order

to make the statements made, in light of the circumstances under which they were made, not misleading.

48.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

49.     Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control

over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

50.    Individual Defendants, who are or were senior executives and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other DouYu personnel to members of the investing public, including Plaintiff and the Class.

51.    As a result of the foregoing, the market price of DouYu securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of DouYu securities during the Class Period in purchasing DouYu securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

52.    Had Plaintiff and the other members of the Class been aware that the market price of DouYu securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which

Defendants did not disclose, they would not have purchased Company securities at the artificially inflated prices that they did, or at all.

53.     As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

54.     By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of DouYu securities during the Class Period.

### COUNT II
### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

55.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

56.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's misstatement of revenue and profit and false financial statements.

57.     As officers of a public business, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public

statements issued by the Company which had become materially false or misleading.

58.    Because of their positions of control and authority as senior executives and/or directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Company securities.

59.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a)    declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of

the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b)     awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c)     awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: June 9, 2023

**THE ROSEN LAW FIRM, P.A**
/s/ Laurence M. Rosen
Laurence M. Rosen, Esq.
One Gateway Center, Suite 2600
Newark, NJ 07102
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*