UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| DAVID RIGO FERNANDEZ, Individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> DOUYU INTERNATIONAL HOLDINGS LIMITED, SHAOJIE CHEN, and MINGMING SU, <br><br> Defendants. | **Case No: 2:23-cv-03161-EP-ESK** <br><br> **SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> <u>JURY TRIAL DEMANDED</u> |

Lead Plaintiffs Raphael Seiler and Pedro Reyes ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their second amended complaint against Defendants DouYu International Holdings Limited ("DouYu"), Shaojie Chen, and Mingming Su ("Defendants"), allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters based on the investigation they conducted by and through their attorneys, which included, among other things, a review and analysis of: (i) DouYu's public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) DouYu's public filings with Chinese regulatory agencies and its local provincial offices; (iii) public reports and news articles; (iv) transcripts of DouYu's conference calls; (v) interviews with

1

witnesses with relevant information; and (vi) other publicly-available material and data identified herein. Plaintiffs' investigation is continuing, and many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their control or custody. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a class action on behalf of persons or entities who purchased publicly traded DouYu American Depositary Shares ("ADS" or "ADSs") between April 30, 2021 and November 27, 2023, inclusive (the "Class Period"). Plaintiffs seek to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act"). Excluded from the Class are Defendants, the present and former officers and directors of the Company and their immediate families and their legal representatives, heirs, successors or assigns and any entity in which such present and former officers and directors have or had a controlling interest, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.  Excluded from this Class are those who purchased the Company securities on private transactions and/or private exchanges.

2.      DouYu is a Chinese livestreaming platform listed on the Nasdaq. It predominantly derived its revenue from commissions it earned through virtual gifts that viewers sent to streamers during their livestreaming performances on the platform. This livestreaming revenue accounted for more than 90% of the Company's overall revenue.

3.      Throughout the Class Period, DouYu had declining user engagement and a decrease in virtual gifts received, resulting in diminished revenue. To counter these challenges and inflate its financial performance, DouYu secretly assisted streamers on its platform in organizing illegal gambling activities, thereby violating Chinese law.

4.      DouYu devised a script for streamers to conceal the Company's involvement. The script directed streamers to transfer cash prizes to gamblers through unrelated third-party channels to evade Chinese gambling laws. Concurrently, in its SEC filings DouYu falsely portrayed itself to investors as responsibly managing content on its platform. DouYu also failed to disclose to investors its misconduct and the associated material risks that the Chinese authorities would impose significant penalties on DouYu, which would materially and adversely impact DouYu's business and operations.

5.      Furthermore, in March 2023, unbeknownst to investors, DouYu made additional efforts to counter declining revenue. It relaxed the enforcement of its

3

internal regulations on explicit pornographic content on its platform and actively encouraged streamers to livestream pornographic material to attract paying users. This change in policy and active involvement in pornographic content directly violated Chinese law.

6.    Despite repeated warnings and orders from the Chinese government to rectify this misconduct, DouYu persisted in its non-compliance, exposing itself to a material risk of significant penalties from Chinese authorities. Faced with DouYu's defiance, the Chinese government took adverse action against the Company.

7.    On May 8, 2023, the Cyberspace Administration of China (the "CAC"), a powerful Chinese regulatory agency, mandated a one-month rectification for DouYu under the CAC's onsite supervision. On May 9, 2023, DouYu acknowledged the ongoing supervised rectification. Simultaneously, Bloomberg reported that the CAC had previously summoned DouYu for interviews[1] regarding its illegal pornography and gambling content. On this adverse news, DouYu's ADSs fell over 12%.

8.    In October 2023, after reviewing DouYu's submissions, the Chinese government detained Defendant Shaojie Chen ("Chen") in connection with DouYu's gambling and pornography related violations. When media reports

---

[1] In Chinese authorities' terminology, an "interview" refers to a meeting where an entity or individual is summoned to receive regulatory warnings and orders. For further explanation, refer to Footnote 12.

4

revealed Defendant Chen's detention in early November, DouYu's ADS declined more than 10% - further damaging investors.

9.    On November 21, 2023, DouYu announced for the first time that Defendant Chen had been arrested. DouYu stated that Defendant Chen's arrest "may have a material adverse impact" on DouYu.

10.    On November 22, 2023, Chinese authorities announced that Defendant Chen was officially arrested for the "crime of operating a gambling establishment." Under Chinese law, escalating Chen's detention to an official arrest demonstrates that Chinese authorities had evidence supporting Defendant Chen's crime and decided to proceed with his prosecution.   On this news, DouYu's ADS price dropped by $0.57 per ADS or 5.93%, on November 21, 2023, followed by a further decrease of $0.02 per ADS or 0.22% on November 22, 2023.

11.    On November 25 and 27, 2023, news reports revealed additional details regarding Defendants DouYu and Chen's crimes—namely that Defendants aided, abetted, and coerced money laundering and illegal gambling on its platform. On this news, DouYu ADS price dropped 8.7% on November 27, 2023, and another 4.43%, on November 28, 2023.

## JURISDICTION AND VENUE

12.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

13.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

14.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

15.    In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

16.    Plaintiffs, as set forth in their certifications on file with the Court and incorporated by reference herein (Dkt. Nos. 17-4, 19-5), purchased DouYu ADSs during the Class Period and were economically damaged thereby.

17.    Defendant DouYu is incorporated in the Cayman Islands and has its principal place of business in the People's Republic of China ("China"). DouYu's ADSs trade on the Nasdaq exchange under the ticker symbol "DOYU". DouYu purports to be "a leading game-centric live streaming platform in China and a pioneer in the eSports value chain."

18.    Defendant Shaojie Chen ("Chen") founded the Company and has served as its Chief Executive Officer and Director since May 2014.

19.    Defendant Mingming Su ("Su") has served as the Company's Chief Strategy Officer since November 2015, a Director since October 2016, and the Company's principal financial officer throughout the Class Period.

20.    Defendants Chen and Su are collectively referred to herein as the "Individual Defendants."

21.    Each of the Individual Defendants:

(a)    directly participated in the management of the Company;

(b)    was directly involved in the day-to-day operations of the Company at the highest levels;

(c)    was privy to confidential proprietary information concerning the Company and its business and operations;

(d)    was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)    was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)    was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)    approved or ratified these statements in violation of the federal securities laws.

22.    The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

23.    The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

24.    The Company and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### I.    The Company and Its Sliding Revenue and Users

25.    DouYu is a China-based online platform company that provides gaming and entertainment livestreaming. Broadcasters, known as streamers, broadcast real-time content, such as gameplay, live performances, talk shows or other forms of entertainment on DouYu's platform. Viewers access these livestreams via mobile apps or computer and interact with the streamers as the content is being broadcasted.

26.    Viewers can buy virtual gifts from DouYu's platform and send them to streamers as a gesture of appreciation or support. The prices for these virtual gifts range from approximately RMB0.1 (approximately US$0.014) to approximately RMB2,000 (approximately US$274.35) each. When a streamer receives a virtual gift, that virtual gift is displayed in his or her profile. Based on pre-negotiated agreements between DouYu, and streamers or streamers' agencies, DouYu takes a share from virtual gifts that streamers receive, which constitutes almost all of DouYu's livestreaming revenue. Livestreaming revenue, in turn, is the primary source of DouYu's total revenue and constitutes over 90% of DouYu's revenue. According to the Company, DouYu's livestreaming revenue is primarily driven by the number of paying users as well as the average livestreaming revenue per paying user (or "ARPPU") in a given period. As disclosed by DouYu, a failure to continue

to grow or maintain paying users and/or a failure to increase revenue per paying user, DouYu's livestreaming may materially and adversely affect DouYu's business operation and financial results.

27.    In July 2019 DouYu conducted its initial public offering ("IPO") on the Nasdaq and was the largest game-centric live streaming platform in China at that time. From its IPO until the following year, 2020, DouYu experienced its peak operational performance. During 2019 and 2020, DouYu's annual paying user count reached 17.5 million and 20.7 million, respectively. The Company generated revenues of RMB 7,283.3 million and 9,601.9 million during the same period, with 90.9% and 92.2%, respectively, attributed to livestreaming.

28.    However, post-2020, DouYu's performance began to decline as reflected in key performance metrics. In 2021 and 2022, the annual paying user base decreased to 17.5 million and 15.5 million, respectively. The revenue generated during these years was RMB 9,165.3 million and 7,108.2 million, with 93.8% and 95.6%, respectively, attributed to livestreaming.

29.    The Chinese government's intervention in 2021 to block the merger of DouYu and Huya, another videogaming streaming platform, dealt a severe blow to DouYu's already declining business. In an attempt to attract paying users, boost spending on the virtual gifts, and revitalize dwindling revenue, DouYu found it imperative to offer "popular and attractive content… engaging and satisfying

viewing experiences." In a desperate move, DouYu resorted to practices such as gambling and pornography, actions prohibited by Chinese law.

## II.    DouYu, Through Its Streamers, Secretly Organized Illegal Gambling

30.    As disclosed by DouYu, the Company heavily relied on its top streamers to create engaging content, attract paying users and generate revenue. According to DouYu, the top streamers on DouYu's platform have large fan bases that regularly support the streamers with virtual gifts. DouYu typically entered into exclusive contracts with its top streamers, under which DouYu, streamers, and streamers' agencies, if any, would share the revenue from virtual gift sales attributable to the streamers' livestreams based on a pre-negotiated split ratio. Therefore, the more virtual gifts a streamer received from their viewers, the more revenue that DouYu obtained.

31.    The revenue-generating prowess of the top streamers on DouYu's platform is astonishing. According to an article published on Sohu.com on April 15, 2020, entitled "DouYu Live Streamer Income Ranking: The Combined Monthly Income of the Top Ten Exceeds One Billion, with 9438 Ranking First," the revenue generated by the top ten streamers on DouYu's platform from receiving virtual gifts for 29 days, from March 16 to April 14, 2020, accounted for 17% of DouYu's total revenue. The streamer groups "Changsha Xiangcun Gansidui" (Changsha Rural Daredevil Team) and Shanshanjiu Huwai, who were specifically mentioned in

11

DouYu's 2020-2022 annual reports filed with the SEC, secured the top two positions in terms of the value of virtual gifts received, amounting to RMB 37,309,300 (approximately US$5.41 million) and RMB 20,026,600 (approximately US$2.9 million) respectively in just one month.

32.    As the Sohu report showed, the majority of the revenue generated by the top ten streamers were from virtual gifts received in connection with a Magic-themed lucky draw event (essentially a tiered-chances lottery) organized by DouYu. According to DouYu's Magic event rules, when a viewer purchased and gifted one Magic Ball to a streamer, the viewer would have a 5.2% chance to win a Magic Crown; for 10 Magic Balls, 3.6% chance to win a Magic Wand; for 30 Magic Balls, 3.5% chance to win a Magic Park. Each Magic Ball was RMB 10 (approximately US$1.43). As reported by Sohu.com, in that month in 2020, Changsha Xiangcun Gansidui received RMB 15.46 million (US$2.24 million) in Magic-themed gifts, constituting 41% of their total virtual gifts, while Shanshanjiu Huwai received RMB 13.63 million (US$1.98million) in Magic-themed gifts, representing 68% of their total virtual gifts.

33.    In 2020 alone, Changsha Xiangcun Gansidui reportedly received RMB 177 million (US$25.65 million) and Shanshanjiu Huwai received RMB 114 million (US$16.52 million) in virtual gifts. These two streamers also ranked as the top two recipients of virtual gifts across all livestreaming platforms in China.

34.     The reason that they could attract so many paying users, gifting them such a large number of gifts, was simple: gambling in the form of a lucky draw lottery.

35.     Changsha Xiangcun Gansidui offered a prize worth RMB 4,500 in virtual gifts to every viewer who won a Magic Park in the luck draws, while Shanshanjiu Huwai provided a prize worth RMB 4,100 in virtual gifts. Some other streamers even offered prizes worth as much as RMB 5,000. This means that if a viewer spent RMB 300 to purchase 30 Magic Balls and gifted them to one of those streamers on DouYu's platform, the viewer would have a 3.5% chance to win a Magic Park and receive 14 to 17 times the original bet the viewer made. This lucrative return undoubtedly attracted an enormous number of viewers to visit DouYu's platform, enticing them to purchase and bet virtual gifts on particular streamers in the hope of obtaining a financial windfall that is the appeal of gambling. This fits the classic definition of gambling prohibited by Chinese law, albeit with a twist.

36.     Under Chinese law, organizing gambling is a crime, and the nature and severity of a gambling activity is assessed based on the cash amount involved. To hide its involvement in the gambling operation, DouYu provided directions to the streamers to structure the payouts of the lucky draw in a way to obfuscate DouYu's involvement and attempt to hide that the lucky draw was simply a form of gambling.

The structure began with no direct cash payments on the DouYu platform to the winners. Such cash payments would directly implicate DouYu in the organization or facilitation of gambling, streamers. Instead, DouYu directed the streamers to pay the winning gamblers in the form of virtual gifts on the platform. Thereafter, the streamers would privately pay the winning gamblers in cash, equivalent to the value of the virtual gifts received by the winners, through third-party channels unassociated with DouYu.

37.    According to Article 303 of the Criminal Law of China, the crime of gambling refers to organizing or engaging in gambling for profit, punishable by imprisonment for up to three years, criminal detention, or control, along with a fine. A person who operates a gambling establishment faces imprisonment for not more than five years, criminal detention, or control, and a fine. In cases of serious circumstances, the sentences will range from imprisonment for not less than five years to not more than ten years, accompanied by a fine. The Interpretation on Several Issues Concerning the Specific Application of Laws in Handling Criminal Cases of Gambling, issued by the Supreme People's Court of China and the Supreme People's Procuratorate of China [2] in 2005 further explains that the following

---

[2] The Supreme People's Court is the highest judicial organ in China. The Supreme People's Procuratorate is the chief prosecutor of China. While they do not create new laws, the interpretations issued by the Supreme People's Court of China and the Supreme People's Procuratorate of China help in the application and understanding of existing laws and are binding and authoritative within the scope of the issues they

situations, *inter alia*, fall under the category of "organizing gambling activities" for

profit in Article 303 of the Criminal Law:

> a. Organizing gambling activities involving three or more participants, with the total amount of commissions reaching or exceeding RMB5,000;
> b. Organizing gambling activities involving three or more participants, with the total gambling capital reaching or exceeding RMB50,000;
> c. Organizing gambling activities involving three or more participants, with the cumulative number of participants reaching or exceeding 20;
>
> …
>
> The person knowing that others are engaging in gambling criminal activities and providing direct assistance, such as funding, computer networks, communication, and expense settlement, is jointly liable for the crime of gambling.

38.    In 2007, China's Ministry of Public Security, Ministry of Industry and

Information Technology, Ministry of Culture, and General Administration of Press

and Publication jointly issued the "Notice on Regulating the Order of Online Game

Operation and Prohibiting Online Gambling." The notice provides that online game

service providers (such as DouYu) are prohibited from offering services that involve

trading or exchanging game points for real cash or property using terms such as

"virtual currency." Additionally, online game service providers are not allowed to

provide services for transferring game points between users. DouYu cited this notice

---

address.

in every annual report filed with the SEC during the Class Period when discussing Chinese regulatory restrictions on virtual currency and their adverse impacts on DouYu's revenues, business and reputation.

39.    According to the "Opinions on the Application of Laws in Handling Criminal Cases of Online Gambling" issued by the Supreme People's Court, the Supreme People's Procuratorate, and the Ministry of Public Security in 2010, individuals or entities knowingly providing services such as internet access, server hosting, network storage space, communication transmission channels, advertising, member development, software development, technical support, etc., to gambling websites, and charging corresponding service fees, are considered accomplices to the crime of operating  a gambling establishment.

40.    On December 15, 2019, the CAC promulgated the Provisions on the Ecological Governance of Network Information Contents, which became effective on March 1, 2020. It mandates that network platform operators like DouYu and content creators such as DouYu's streamers refrain from disseminating illegal content, including but not limited to gambling, pornography, or obscenity. DouYu consistently referenced this regulation in every annual report filed with the SEC during the Class Period when discussing Chinese regulations on internet content and its associated risks on DouYu's operations in case of non-compliance. The CAC is a powerful agency directly supervised by the President of China and is authorized to

16

impose severe penalties if it determines that a business is violating any internet-related laws or regulations. This authority allows the CAC to enforce penalties without permitting the business an opportunity to challenge its determinations. Such penalties include, *inter alia*, significant fines, business suspension, business close-down pending rectification, website shutdown, and revocation of business licenses and permits.

41.    Under Chinese law, including the above-referenced laws and regulations, if the streamers who organized gambling, promoted gambling, and transferred cash to gamblers did so on DouYu's platform, DouYu would unequivocally be implicated, at a minimum, in the crime of aiding and abetting the organization of gambling, or in the crime of operating a gambling establishment in more severe cases. Reflecting its knowledge that its conduct was illegal, DouYu constructed the means of obfuscating its involvement in the illegal gambling scheme from beginning (solicitation) to end (payouts). DouYu devised a script that its streamers were required to follow to surreptitiously attract gamblers to bet on DouYu's platform, thereby increasing DouYu's revenue, while avoiding suspicion from Chinese authorities regarding DouYu's involvement in facilitating gambling. DouYu created the script utilized in the execution of the gambling to hide its involvement and attempt to foist the idea that the games were something other than illegal gambling. And, as alleged elsewhere, DouYu created the scheme through

which the streamers would structure the payouts in order to obfuscate DouYu's role.

42.    Qian Xiaojia, a former top streamer on DouYu, revealed how DouYu instructed its employees and the streamers to evade detection by Chinese authorities.[3] Qian Xiaojia unveiled a document obtained from Douyu, compiled by DouYu and called the "Magic Ball Script," which imposed strict regulations on the language used by streamers during livestreaming gambling activities on its platform. The Magic Ball Script read, *inter alia*, that the streamers

> are allowed to verbally state or post the following language to divert users to +VX[4] or QQ[5] to learn the meaning of such language: (i) **users who sent out goods: add WeChat (or QQ); special local products (or welfare) available…**

(Emphasis added.)

43.    While this messaging appears coded to non-participants or those not intimately familiar with the parlance of Chinese messaging apps, it was plainly obvious to the gamblers. This carefully crafted message, which DouYu highlighted in red, directed the streamers to inform the gamblers placing their bets that they should connect to the streamers via third-party means, such as the messaging apps

---

[3] https://m.163.com/dy/article/IIVMVPER0526VGN7.html
[4] "+VX" denotes the action of adding or connecting through Wei Xin or WeChat, a widely used texting app in China that is not associated with DouYu. The term originates from the colloquial pronunciation of "Wei Xin" as "Vei Xin," owing to the common substitution of the letter "w" with "v" in Chinese pronunciation. Consequently, the abbreviated form "VX" is commonly used to refer to Wei Xin. WeChat allows people who are connected to transfer cash through WeChat.
[5] "QQ" is another popular texting app in China that is not associated with DouYu.

WeChat or QQ, in order to obtain further details about claiming their cash prizes in the event they win. The Magic Ball Script stated that streamers were allowed to mention single-digit numbers, but "should not show any specific numbers in thousands/tens of thousands, which could equate with cash prizes." According to the Script, the "simultaneous appearance of" terms like "cash", "cashback", "cash redemption" or any of the Magic-themed items, such as "Magic Ball," "Magic Park," "Magic Wand," "Magic Crown," with numbers or letters is "absolutely prohibited." The script then stated that the streamers were "absolutely prohibited from communicating any cash redemption matters with users via the private messaging [function on the Douyu platform]."[6] The script specifically directed DouYu's employees that they "should not send the above contents [i.e., the script file] directly to the streamers or their agencies" and "should not leave written information." Instead, reflecting the concern of leaving obvious evidence of DouYu's involvement, the script stated, "it is better for [DouYu's] Operations to verbally communicate with the agencies and the streamers."

44.    Nearly all top streamers received the requirements set forth in the

---

[6] Private messaging is a feature offered by DouYu on its platform which enables users to send private messages to a particular streamer by clicking "Send Internal Message." This allows private communications without other viewers seeing the messages in the streaming room. https://jingyan.baidu.com/article/fec4bce290d43ef2608d8b57.html

Magic Ball Script at the beginning of 2020 and continuing through 2022[7].  Former employees overseeing the streaming rooms at DouYu have corroborated that gambling activities, like those carried out by "Shanshanjiu Huwai" and "Changsha Xiangcun Gansidui," were all guided by the scripts taught by DouYu's personnel to evade scrutiny.[8]

45.    Under revenue split ratio agreements between DouYu and streamers, streamers usually retained 30-45% of the revenue from virtual gifts received in legal performances. However, to incentive streamers to engage in the organized gambling, DouYu increased the revenue share and typically offered a 50% revenue share to streamers involved in organizing gambling.[9]

46.    Notably, according to Qixinbao, a corporate database that collects all official corporate registration, IP rights, legal disputes information regarding a company in Chian, DouYu has owned 5% of the company that owns the Shanshanjiu Huwai team since July 2020 and 4% of the company that owns the Changsha Xiangcun Gansidui team since August 2020.

---

[7] https://m.jiemian.com/article/10347845.html;
https://www.wenshannet.com/index.php/company/79583.html
[8] https://xueqiu.com/8523475459/250011852
[9]    https://m.jrj.com.cn/madapter/finance/2023/11/07182638306404.shtml#:~:text=
%E6%96%97%E9%B1%BC%E4%B8%BB%E6%92%AD%E5%A4%9A%E6%
AC%A1%E6%B6%89%E5%AB%8C%E8%B5%8C%E5%8D%9A&text=%E4%
BB%85%E8%BF%99%E4%B8%80%E4%B8%AA%E7%9B%B4%E6%92%AD
%E9%97%B4,%E6%B5%81%E6%B0%B4%E9%AB%98%E8%BE%BE1.1416
%E4%BA%BF%E5%85%83%E3%80%82

47.     When the Chinese media raised suspicion that Shanshanjiu Huwai and Changsha Xiangcun Gansidui were organizing gambling, DouYu denied such allegations and suggested that such activities were allowed under the Anti-Unfair Competition Law as long as the lottery amount did not exceed RMB 50,000. Such statements from DouYu, however, misleadingly diverted the public's attention to an irrelevant law and hid the fact that DouYu and its streamers were violating Chinese criminal law, thereby subjecting DouYu to the material risk of adverse impacts on its business both in the forms of prosecution but also the subsequent decline in revenues that would result from it having to cease such operations.

48.     DouYu's assertion of innocence also contradicted its knowledge of the regulations prohibiting gambling on the platform. The administrative penalty notice, numbered "(Wu) Wen Fa Zi (2019) No. F-000002" issued by Wuhan Cultural and Tourism Bureau on January 28, 2019 shows that on January 22, 2019, the bureau found, during an onsite inspection, that Wuhan DouYu Network Technology Co., Ltd. ("Wuhan DouYu"), DouYu's primary operating subsidiary, was promoting obscenity, gambling, violence, or inciting crime prohibited Article 6(1) of the Management Measures for the Operation of Online Performance Activities and Articles 16(7) and 16(9) of the Provisional Measures on Administration of Internet Culture ("Provisional Measures"). The bureau fined Wuhan DouYu RMB 30,000 and confiscated the illegal income of RMB 1,219.2 on January 28, 2019. Articles

16(7) and 16(9) of the Provisional Measures prohibit contents "promoting obscenity, gambling, violence, or inciting crime" or "harmful to social morality or the cultural traditions of the country." DouYu discussed the Provisional Measures in detail under the section of regulations relating to online culture activities in every annual report it filed with the SEC during the Class Period evidencing that it understood the controlling regulations it was violating.

49.    Even after Chinese authorities detained the Shanshanjiu Huwai team members in November 2020 for the alleged crime of gambling, DouYu's annual reports filed with the SEC during the Class Period still attempted to portray its innocence. The reports explicitly denied prior knowledge of and involvement in the misconduct of streamers like "Shanshanjiu Huwai" and "Changsha Xiangcun Gansidui" on DouYu's platform. Specifically, DouYu consistently stated in its annual reports during the Class Period that,

> It was reported that "Shanshanjiu Huwai" and "Changsha Xiangcun Gansidui," … initiated lucky draws during their streaming sessions and then repurchased gifts from winning users offline, in order to attract and incentivize users to participate in the lucky draw on our platform, **in violation of the rule and policy of our platform. Such activities are explicitly forbidden by our platform** and may be suspected of being involved in illegal gambling activities by these streamers. We have blocked these streamers' accounts after we became aware of those incidents.

(Emphasis added.)

50.    On February 15, 2023, the Chengdu Intermediate People's Court

published the outcome of the Shanshanjiu Huwai case, listing it as one of the Top Ten Highlighted Cases of 2022. According to the court's publication, between March 2017 and September 2020, Shanshanjiu Huwai organized 4,267 lotteries with 4.42 million participants involving nearly RMB 120 million (US$17.4 million) in gambling funds. Shanshanjiu Huwai disseminated information about the lotteries on DouYu and WeChat in order to attract a significant number of individuals to join the live streams on DouYu and partake in the lotteries. Following the lotteries, Shanshanjiu Huwai distributed cash prizes to the winners. The members of the Shanshanjiu Huwai team received varying prison sentences, with the two leading team members sentenced to six years' imprisonment respectively, accompanied by fines. The court highlighted that the Ministry of Public Security, a Chinese central governmental agency, supervised this case.[10]

51.    DouYu's annual report for the fiscal year ended December 31, 2022 filed on April 25, 2023 ("2022 Annual Report") filed with the SEC on April 25, 2023, two months after the judgment on the Shanshanjiu Huwai case was announced, still made the same representation as previous annual reports, denying prior knowledge of and involvement in the misconduct of streamers like Shanshanjiu Huwai.

---

[10] http://cdfy.scssfw.gov.cn/article/detail/2023/02/id/7150601.shtml
; http://sc.people.com.cn/n2/2023/0216/c345459-40303310.html

52.    However, DouYu's misleading, and repeated, denials of participation in the gambling crime did not mean it would escape material consequences.

53.    On February 27, 2023, the CAC released the outcomes of the 2022 anti-pornography and anti-illegal publications campaign.[11] DouYu and a few other platforms were specifically highlighted for their misconduct of disseminating "harmful and inappropriate content," such as obscenity and enticing virtual gifting. The report disclosed that the CAC had conducted interviews[12] with the platforms, including DouYu, directing them to address the misconduct within a specified timeframe. The report also disclosed that "stringent actions" had been taken against those responsible, and "fines" had been imposed.

54.    On April 29, 2023, E.T., the CAC announced the outcomes of the "Clear" series special action for the first quarter of 2023. It specifically highlighted that a few online platforms, including DouYu, failed to effectively manage the information posted by their users, resulting in the dissemination of harmful content such as pornography and inducements to gambling. The CAC disclosed that it had

---

[11] http://www.cac.gov.cn/2023-02/27/c_1679136693877153.htm

[12] In the context of Chinese law, "interview" refers to a process where relevant authorities, upon identifying unlawful or irregular behavior in businesses, institutions, or individuals, initiate oral or written communications. These communications require the involved parties to appear at designated locations for questioning, clarification, criticism, and educational measures with a punitive nature. Typically, Chinese authorities conduct interviews to issue warnings, regulate behavior, prompt corrective actions, and prevent the continuation of illegal activities.

directed its local offices to interview the principals of those platforms, issued orders for rectification within a specified period, rigorously penalized those responsible, and imposed fines. [13] Notably, DouYu was the only company that the CAC mentioned twice for content violations from the beginning of 2023 to April 2023, evidencing that DouYu had failed to fully rectify its violations according to the orders and allowed the violations to persist.

55.    Unsatisfied with DouYu's responses to the regulatory inquiries and orders, the Chinese government escalated its enforcement. On May 8, 2023, the CAC announced that "in response to the severe ecological issues, including pornography and vulgarity, on the DouYu platform, on May 8, the Cyberspace Administration of China directed the Internet Information Office of Hubei Province to deploy a working group to the DouYu platform for a one-month concentrated rectification and supervision." Following this news, DouYu's ADS price experienced an immediate 14% decline during pre-market hours.

56.    On May 9, 2023, DouYu acknowledged the CAC's ongoing investigation and stated that it would fully cooperate and was conducting a comprehensive internal review of its content monitoring system. DouYu pledged that it "plans to implement all necessary remedial measures based on the CAC inspection and its own internal review." On the same day, Bloomberg reported that

---

[13] http://www.cac.gov.cn/2023-04/30/c_1684501637698699.htm

it was not the first time DouYu received the regulatory enforcement action from the CAC - the CAC had previously summoned the "bosses" of certain Chinese platform companies, including DouYu, for talks (or interviews) about "violations," including "pornography" and "redirecting visitors to gambling," and demanded them "to rectify the issues within a fixed period of time." The market started to digest the series of news and the severity of DouYu's violations. Investors had come to understand that, in light of DouYu's purported commitment to cooperation, the cessation of illicit activities on DouYu's platform would erase a material portion of DouYu's revenue. The anticipation of such consequences prompted a further sell-off of the Company's ADSs. On May 9 and 10, 2023, DouYu's ADS price dropped by 2.78% and 9.33%.

57.    Indeed, DouYu's one-month "concentrated rectification," supervised by the CAC, to eliminate the revenue-generating illegal contents had a material adverse impact on DouYu's performance. On August 14, 2023, DouYu reported its financial results for the second quarter of 2023: total net revenue for 2023 Q2 declined by 24% compared to the same quarter in 2022, and quarterly average paying users for 2023 Q2 dropped by 39.4% from 2022 Q2, marking the worst quarterly performance since DouYu's IPO.

58.    During the 2023 Q2 earnings call on the same day, Defendant Chen revealed the content management procedures DouYu had started to execute in the

second quarter, including "upgrad[ing] the review criteria, adding and refining over 30 items", "appl[ying] … content monitoring, filtering and event-triggered handling", and "strengthen[ing its] management system and staff training and evaluat[ing] the awareness of content management and regulatory guidelines."

59.    On the same 2023 Q2 earnings call, when questioned about "any updates" on the one-month investigation by the CAC, Defendant Chen portrayed a positive outlook, emphasizing that DouYu had returned to "normal internal supervision mode." He stated that during the inspection, DouYu had cooperated by providing all "company information that was requested, such as [its] policies and procedures for content review and our content approval review process." However, Defendant Chen omitted the fact that the information submitted by DouYu was still under review by Chinese authorities, posing a material risk that the Chinese authorities could discover additional evidence regarding DouYu's violations during the review process resulting in further material regulatory actions against DouYu.

### III.    Additionally, DouYu Secretly Relaxed Its Regulation on Pornography to Attract Paying Users

60.    In China, engaging in the production, distribution, or sale of sexually explicit materials is a criminal offense, punishable by potential life imprisonment for those found guilty. Furthermore, under Article 365 of the Criminal Law of China, a person organizing obscene performances may face imprisonment of up to ten years.

61.     DouYu has a history of receiving warnings and directives from Chinese authorities regarding the presence of pornography and indecent content on its platform. Consequently, DouYu was fully aware of the legal standards concerning prohibited obscene content.

62.     For example, the administrative penalty notice, numbered "(Wu) Wen Fa Zi (2019) No. F-000002" issued by Wuhan Cultural and Tourism Bureau on January 28, 2019 evidences that DouYu was penalized for publishing contents violating the Management Measures for the Operation of Online Performance Activities and the Provisional Measures.

63.     The administrative penalty notice, numbered "(Wu) Wen Zong Fa Zi (2020) No. F-000009" issued by Wuhan Cultural and Tourism Bureau on September 27, 2020 states that on August 24, 2020, the law enforcement officers conducted a detailed inspection of 68 live video recordings from DouYu provided by Wuhan City's Anti-Pornography and Non-Illegal Work Group Office. On August 25, the law enforcement officers inspected Wuhan DouYu onsite and "reviewed" and "confirmed onsite one by one" its findings on the recordings with Wuhan DouYu's "main responsible person and relevant department heads." Through the investigation, law enforcement officers concluded that DouYu's content contained vulgar performance and fined DouYu RMB 30,000 and confiscated the illegal income of RMB 3,988.7.

64.    The administrative penalty notice, numbered "(Wu) Wen Zong Fa Zi (2022) 2101601" issued by Wuhan Cultural and Tourism Bureau on September 1, 2022 states that following the notice from the Wuhan City "Anti-Pornography and Anti-Illegal" Working Group Office regarding the investigation into certain streamers' vulgar performances on DouYu (Wu Sao An Du [2022] No. 38), on August 11, enforcement officers from Wuhan Cultural and Tourism Bureau conducted a remote examination of evidence, including video recordings, screenshots. On August 12, the bureau conducted an on-site investigation at Wuhan DouYu, finding that three streamers had vulgar performance. The bureau fined DouYu RMB 30,000 and confiscated the illegal income of RMB 435.9.

65.    Furthermore, as stated above, in 2020 and the first quarter of 2023, the CAC twice pointed out DouYu's violations, ordering it to rectify the problems in a specified timeframe.

66.    Despite DouYu's clear understanding of the regulations it was obligated to follow, and the need to correct violations, DouYu chose to exploit viewers' prurient interests and loosen its internal regulations on pornography, encouraging  its streamers to entice users to buy them virtual gifts for their explicit language and behavior, in order in bolster DouYu's declining financial performance,.

67.    Before March 2023, DouYu employed a 12-point "livestreaming

scoring system" for its streamers. Violating DouYu's internal regulations would result in point deductions. Streamers with 8 points or fewer would receive fewer recommendations from DouYu, reducing their chances to receive virtual gifts and, consequently, income. Those with 5 points or fewer would be designated as "free" streamers, with DouYu prohibiting them from receiving virtual gifts and freezing their earnings.

68.    In March 2023, DouYu stopped enforcing the scoring system. This means that even if a streamer lost points for engaging in pornographic or lewd behavior, they could still retain their earnings. Even if temporarily banned, the streamer could immediately resume streaming, suffering no financial consequences. This was a significant departure from DouYu's previous policies, which would impose permanent bans for significant violations. In the meantime, DouYu launched the "Hot Dance Weekly Tournament" activity from 4:00 p.m. to 11:00 p.m. each day in March 2023, enticing viewers to watch and pay to interact with sexually explicit dancing streamers.

69.    The lewd streams immediately exploded on DouYu. DouYu's obscene content had become so popular in China that terms such as "DouYu Official Promotion of Soft Porn Performances" and "DouYu Dance Zone" immediately became the most searched terms on the internet in China. Three news outlets therefore conducted independent investigations into DouYu's misconduct.

70.    On March 30, 2023, "Storm Eye," an investigative journalism program on iFeng.com [14], reported user complaints about explicit content on DouYu. Investigating further, a Storm Eye journalist found that DouYu, upon user registration, immediately pushed a streaming notification featuring what DouYu marketed as "sitting and snapping," but was, in actuality, a sexual performance. The journalist observed that the streamers were actively encouraging viewers to comment on the streamers' private body parts, requesting gifts, and hinting that reaching a specific gift value would grant access to a VIP group where "all the benefits you desire are available, even those you can't imagine." Storm Eye also reported that DouYu had even started pushing explicit content to non-users.

71.    On April 3, 2023, the New Express Report reported the investigation conducted by one of its reports. The report stated that on the evening of March 30, 2023, one of its journalists went onto DouYu's platform and observed that the livestreaming rooms featured on DouYu's homepage were all explicit dance performances. Female dancers were all wearing revealing costumes or intimate apparel, with some outfits so short that they were about to expose their private parts. While twisting and shaking their bodies, the steamers were enticing viewers in a flirtatious way, requesting follows and gifts. At around 9:00 p.m., the reporter observed on DouYu's "Hot Dance Channel" that female streamers were "hot

[14] https://tech.ifeng.com/c/8OZtVfgN6DO

dancing." On-screen instructions prompted viewers to purchase DouYu's virtual currency to engage with streamers through likes or follows.[15]

72. On April 7, 2023, the "Future Net", a website established by the Central Committee of the Communist Party of China for the All-China Youth Federation, reported that it had received numerous complaints from Chinese parents concerning explicit content on DouYu and its potential harm to children. The Future Net conducted an investigation into DouYu's content and observed similarly widespread illegal content on the platform.[16]

73. Meanwhile, however, DouYu continued to falsely represent to the investing public that "[w]e endeavor to eliminate illicit content from our platform" and "ha[d] adopted various actions and internal policies to manage our streamers to comply with" Chinese regulations on pornography in its SEC filing. In its 2022 Annual Report, DouYu extensively discussed the relevant Chinese laws and regulations pertaining to pornography and lewd content. The 2022 Annual Report detailed the internal actions and policies implemented by DouYu to combat pornography, creating an impression of compliance. These representations were in direct conflict with DouYu's active promotion of sexually explicit content on its platform that exposed it to a significant risk of penalties from Chinese authorities.

---

[15] https://www.sohu.com/a/662261245_119778#google_vignette
[16] https://news.k618.cn/dj/202304/t20230407_19670159.html

74.    As alleged earlier, on May 8, 2023, the CAC announced a one-month onsite supervision for DouYu to carry out a "concentrated rectification." This rectification process, aimed at eliminating DouYu's revenue-generating misconduct, led to a significant downturn in DouYu's financial performance, marking its worst period since its IPO.

75.    Furthermore, subsequent to the one-month onsite regulatory enforcement, DouYu, when questioned, omitted material information from the public regarding the ongoing review of DouYu's submissions by Chinese authorities and its associated material risk of further significant penalties. Shortly thereafter, Chinese authorities detained Defendant Chen and subsequently officially arrested him in connection with Defendants' criminal activities.

## IV.    <u>Affirmative Duty to Disclose Known Uncertainties</u>

76.    Further, Defendants were required to comply with Part I, Item 5(D) Form 20-F and Item 303 of Regulation S-K, 17 C.F.R. § 229.303, and failed to do so.

77.    Part I, Item 5(D) Form 20-F, requires registrants to:

[D]iscuss, for at least the current financial year, any known trends, uncertainties, demands, commitments or events that are reasonably likely to have a material effect on the company's net sales or revenues, income from continuing operations, profitability, liquidity or capital resources, or that would cause reported financial information not necessarily to be indicative of future operating results or financial condition.

78.    Even a one-time regulatory event, if "reasonably expect[ed]" to have a material impact on the company must be disclosed.

79.    Item 5(D) of Form 20-F "call[s] for the same disclosure as Item 303 of Regulation S-K".[17]  And pursuant to Item 303, issuers must disclose actual and contemplated regulatory action or "changes in" the "regulatory environment[.]"  *In Re Comm'n Guidance Regarding MD&A of Fin. Condition & Results of Operation*, Release No. 8350 (Dec. 19, 2003) (the "2003 Guidance") available at 2003 WL 22996757, *1 nn.1, 27.

80.    Regulation S-K provides that the discussion of known trends, uncertainties, and events should appear in the section of an issuer's registration statement reporting "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A"). In a 1989 Interpretive Release, the SEC described the purposes of MD&A:

> The Commission has long recognized the need for a narrative explanation of the financial statements, because a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance. MD&A is intended to give investors an opportunity to look at the

---

[17] *See also* SEC Division of Corporation Finance's *Financial Reporting Manual* ("FRM") which provides: "The requirements for MD&A [Management's Discussion & Analysis] are set forth in Item 5 of Form 20-F, under Operating and Financial Review and Prospects (sometimes referred to as the OFR). This Item calls for the same disclosure as S-K 303 …" FRM §9410.1.  FRM §9410.2 further provides: "The requirements of Item 5 of Form 20-F are as follows:  … d. Trend information – Item 5.D."

registrant through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results of operations, with a particular emphasis on the registrant's prospects for the future.

*Management's Discussion & Analysis of Fin. Condition & Results of Operations; Certain Inv. Co. Disclosures*, Release No. 6835 (May 18, 1989) (the "1989 Interpretive Release") available at 1989 WL 1092885.[18]

81.    Item 303 demands disclosure of known uncertainties, events, trends

unless management determines that a material effect on financial condition or results

of operations is not likely to appear. The 1989 Interpretive Release provides the

following test to determine if disclosure under Item 303(a) or Part I, Item 5 of Form

20-F is required:

> Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:
> (1) Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required. (2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results is not reasonably likely to occur.

1989 Interpretive Release, 1989 WL 1092885, at *6

82.    Issuers must disclose both (a) known uncertainties or trends and (b) any

---

[18] The 1989 Interpretive Guidance applies to Item 5(d) of Form 20-F. Form 20-F, Instruction 5 (stating that issuers should refer to the 1989 Interpretive Guidance); 2003 Guidance, at 2003 WL 22996757, *1 n.1 (same).

potential material impact of known trends and uncertainties on their own operations even if the trends are a matter of public knowledge. 1989 Interpretive Release, 1989 WL 1092885 at *6; *see also Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 721 (2d Cir. 2011).

83.     Additionally, as a foreign issuer, DouYu faces heightened obligations to disclose government action under Item 303, which specifically instructs foreign private registrants like DouYu to "discuss briefly any pertinent governmental economic, fiscal, monetary, or political policies or factors that have materially affected or could materially affect, directly or indirectly, their operations or investments by United States nationals." 17 C.F.R. § 229.303, ¶12. There is no corresponding specific requirement for domestic companies.

84.     Throughout the Class Period, DouYu covertly devised mechanisms to aid and abet streamers in organizing gambling activities on its platform. However, Defendants failed disclose this risk, which was reasonably likely to have a material adverse effect on DouYu's operations in any of the annual reports filed on Form 20-F during the Class Period pursuant to Item 303. Following the conviction of Shanshanjiu Huwai members in 2022, the Defendants faced an elevated risk that Chinese authorities could perceive their actions as a criminal offense. This heightened risk imposed a greater obligation on Defendants to disclose this known event and the associated risks in the 2022 Annual Report, as required by Item 303.

85.    Additionally, DouYu facilitated dancers in creating pornographic content and enticing users to pay for such material. Despite this, Defendants failed to disclose this known event, which was reasonably likely to have a material adverse effect on DouYu's operations in the 2022 Annual Report, pursuant to Item 303.

## MATERIALLY FALSE AND MISLEADING STATEMENTS

86.    First, as stated above, Defendants had an affirmative duty, but failed, to disclose the known events relating to DouYu's facilitation of gambling and pornographic contents on DouYu under Item 303.

87.    Second, as specified below, the following statements had created a duty for Defendants to disclose certain material facts, failing which made the statements, in light of the circumstances under which they were made, materially false and misleading.

### 2020 Annual Report

88.    On April 30, 2021, DouYu filed with the SEC its Annual Report on Form 20-F for the year ended December 31, 2020 (the "2020 Annual Report"). Attached to the 2020 Annual Report were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Chen and Su attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

89.    The 2020 Annual Report states, in the relevant part, that

[T]here are online lucky draws, raffles, interactive patterns and other similar activities conducted on our platform to promote user engagement, which involve virtual currencies (such as Yuchi). The prize of such activities can only be used to purchase virtual gifts or to give to streamers as reward on our platform. **We do not believe such activities are specifically prohibited under PRC laws and regulations**…. It was reported that "Shanshanjiu Huwai" and "Changsha Xiangcun Gansidui", two streamers on our platforms, initiated lucky draws during their streaming sessions and then repurchased gifts from winning users offline, in order to attract and incentive users to participate the lucky draw on our platform, in violation of the rule and policy of our platform. **Such activities are explicitly forbidden by our platform** and may be suspected of being involved illegal gambling activities by these streamers.

(Emphasis added.)

90.    The statements referenced above were materially false and misleading because they failed to disclose that DouYu was secretly aiding and abetting streamers on its platform to organize viewer gambling, thereby violating Chinese law. DouYu failed to disclose that, contrary to its statement that "[gambling] activities are explicitly forbidden by our platform," DouYu secretly devised a script for its streamers and directed them to transfer cash prizes through third-party channels to bypass the law. By actively engaging in the organization of gambling activities disguised as innocent lucky draws, DouYu's statement that "[w]e do not believe" those activities were illegal was materially false.

91.    The 2020 Annual Report also states, in the relevant part, that

**We endeavor to eliminate illicit content from our platform.** We have made substantial investments in resources to monitor content that users post on our platform and the way in which our users engage with each

other through our platform. **We use a variety of methods to ensure our platform remains a healthy and positive experience for our users…. Although we employ these methods to filter content posted on our platform**, we cannot be sure that our internal content control efforts will be sufficient to remove all content that may be viewed as indecent or otherwise non-compliant with PRC law and regulations.

\*    \*    \*

**Content Monitoring System**
Our live streaming platform contains real-time content, which **we monitor to maintain a healthy ecosystem and ensure compliance with PRC laws and regulations.** We have developed a comprehensive system to monitor content on our platform and filter inappropriate and illegal content and content that may infringe on the intellectual property rights of third parties.

(Emphasis added.)

92.    The statements referenced above were materially false and misleading because they are contradicted by the fact that DouYu was secretly aiding and abetting streamers on its platform to organize viewer gambling, thereby violating Chinese law. DouYu secretly devised a script for its streamers and directed them to transfer cash prizes through third-party channels to bypass the law. By actively engaging in the organization of gambling activities disguised as innocent lucky draws, DouYu's above statements that it "monitor[ed]" to ensure "compliance" and "endeavor[ed] to eliminate illicit content" were materially false.

**2021Q1 Earnings Call**

93.    On May 18, 2021, DouYu conducted the earnings call for 2021Q1. During the call, Defendant Chen stated that,

39

Meanwhile, our ARPPU increased steadily on a year-over-year basis to RMB285. Although we saw the revision of users, tipping behavior to that of pre-pandemic levels, as the pandemic was gradually brought under control in China, **we continue to execute a proactive operating strategy centered on increasing user interaction to further stimulate users paying habits and grow ARPPU.**

(Emphasis added.)

94.     These statements were materially false and misleading because Defendants failed to disclose that the "proactive operating strategy" was that DouYu was secretly aiding and abetting streamers on its platform to organize viewer gambling, thereby violating Chinese law. DouYu secretly devised a script for its streamers and directed them to transfer cash prizes through third-party channels to bypass the law. This undisclosed "proactive operating strategy" DouYu employed was illegal and unsustainable, subject DouYu to a material risk of significant penalties from Chinese authorities.

95.     On the same 2021 Q1 earnings call, Hao Cao, Vice President, Finance, of DouYu, stated that,

This decline was partially offset by our implementation of **a more effective operational strategies**, which helped to improve the engagement level and paying behavior of key paying users on platform in the period.

\*       \*       \*

Although we were affected by seasonal factors, we maintained **an active and effective operating strategy to stimulate our core paying users interactions and the purchase of willingness**, which helped to create sequential increase in your ARPPU.

(Emphasis added.)

96.    These statements were materially false and misleading because Defendants failed to disclose that the "strategy" was that DouYu was secretly aiding and abetting streamers on its platform to organize viewer gambling, thereby violating Chinese law. DouYu secretly devised a script for its streamers and directed them to transfer cash prizes through third-party channels to bypass the law. This undisclosed "strategy" DouYu employed was illegal unsustainable, and subjects DouYu to a material risk of significant penalties from Chinese authorities.

**2021Q2 Earnings Call**

97.    On August 16, 2021, DouYu conducted the earnings call for 2021Q2. During the call, Defendant Chen stated that,

> During the Quarter, user behavior normalized to pre-pandemic levels. **Through our operating strategy and execution**, we continue to focus on improvements in user engagement and paying user consumption.

(Emphasis added.)

98.    These statements were materially false and misleading because Defendants failed to disclose that the "strategy and execution" were that DouYu was secretly aiding and abetting streamers on its platform to organize viewer gambling, thereby violating Chinese law. DouYu secretly devised a script for its streamers and directed them to transfer cash prizes through third-party channels to bypass the law.

The undisclosed "strategy and execution" DouYu employed were illegal and unsustainable, subject DouYu to a material risk of significant penalties from Chinese authorities.

99.     On the same 2021 Q2 earnings call, Hao Cao, Vice President, Finance, of DouYu, stated that,

> The year-over-year decrease in live-streaming revenues was mostly due to the abnormally high user activity and up in the prior-year period caused by the stay at home orders during the pandemic. In the Second Quarter of this year as the pandemic was gradually brought under control in China u ser behavior had largely normalized, reverting to pre-pandemic levels. This decline was partially offset by **our efforts to improve the spending by our core paying users.**

(Emphasis added.)

100.    These statements were materially false and misleading because Defendants failed to disclose that the "efforts" actually were DouYu's secret aiding and abetting of streamers on its platform to organize viewer gambling, thereby violating Chinese law. DouYu secretly devised a script for its streamers and directed them to transfer cash prizes through third-party channels to bypass the law. The undisclosed efforts were illegal and unsustainable, subject DouYu to a material risk of significant penalties from Chinese authorities.

## 2021Q3 Earnings Call

101.    On November 16, 2021, DouYu conducted the earnings call for 2021Q3. During the call, Defendant Chen stated that,

In the third quarter, our quarterly paying users totaled 7.2 million with an output of [Indiscernible]. We were able to sustain the size of quarter-paying users as we continue to **execute our proactive offering strategy** to improve user engagements and paying user consumption.

\*     \*     \*

Leveraging our **competitive plans** in paying user consumption and virtual gifting. We will continue to explore diversified monetization models and improve our financial performance through effective product developments, streamer engagement, and content operations.

(Emphasis added.)

102.   These statements were materially false and misleading because Defendants failed to disclose that the "strategy" and "competitive plans" included DouYu's secret aiding and abetting of streamers on its platform to organize viewer gambling, thereby violating Chinese law. DouYu secretly devised a script for its streamers and directed them to transfer cash prizes through third-party channels to bypass the law. The undisclosed "strategy" and "competitive plans" DouYu employed were illegal and unsustainable, subject DouYu to a material risk of significant penalties from Chinese authorities.

103.   On the same 2021 Q3 earnings call, Hao Cao, Vice President, Finance, of DouYu, stated that,

Our live streaming business remained relatively stable and our long-term **sustainable operating strategy**. The year-over-year decrease in live streaming revenue was due to **several notable fan engagement designs we launched in the summer of last year led to the increases in paying user conversion**, resulting in higher revenue base in comparison. This decline was partially offset by organic growth of

43

average revenues per paying user, driven about implementation of **more effective operational strategies**.

(Emphasis added.)

104.    These statements were materially false and misleading because Defendants failed to disclose that the "strategy" and "designs" included DouYu's secret aiding and abetting of streamers on its platform to organize viewer gambling, thereby violating Chinese law. DouYu secretly devised a script for its streamers and directed them to transfer cash prizes through third-party channels to bypass the law. The undisclosed "strategy" and "designs" DouYu employed were illegal and unsustainable, subject DouYu to a material risk of significant penalties from Chinese authorities.

**2021Q4 Earnings Call**

105.    On March 16, 2022, DouYu conducted the earnings call for 2021Q4. During the call, Defendant Chen stated that,

> Now turning to monetization. Total number of paying users in the fourth quarter was 7.3 million with an average quarterly ARPU of RMB 305. We continue to enhance engagement and consumption levels from our core users through **sustainable operating strategies and promotional campaigns**, enabling us to sustain a healthy range for our ARPU. While maintaining the stability of revenue from virtual gifting, we will continuously endeavor to explore new revenue streams.
>
> *        *        *
>
> We have continued to explore commercialization initiatives, leveraging our **competitive strengths** in user engagement and paying behavior. Going forward, we will continue to execute our product, streamers and

44

content strategy to further explore and strengthen our monetization capabilities and optimize our financial performance.

(Emphasis added.)

106.   These statements were materially false and misleading because Defendants failed to disclose that the "strategies" and "campaigns" included DouYu's secret aiding and abetting of streamers on its platform to organize viewer gambling, thereby violating Chinese law. DouYu secretly devised a script for its streamers and directed them to transfer cash prizes through third-party channels to bypass the law. Defendants failed to disclose that the "competitive strengths" of the illegal strategy employed by DouYu were illegal and unsustainable, subject DouYu to a material risk of significant penalties from Chinese authorities.

**2021 Annual Report**

107.   On April 29, 2022, the Company filed with the SEC its Annual Report on Form 20-F for the year ended December 31, 2021 (the "2021 Annual Report"). Attached to the 2021 Annual Report were signed certifications pursuant to SOX signed by Defendants Chen and Su attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

108.   The 2021 Annual Report stated, in relevant part, that

[T]here are online lucky draws, raffles, interactive patterns and other similar activities conducted on our platform to promote user engagement, which involve virtual currencies (such as Yuchi). The

45

prize of such activities can only be used to purchase virtual gifts or to give to streamers as rewards on our platform. **We do not believe such activities are specifically prohibited under PRC laws and regulations**. … It was reported that "Shanshanjiu Huwai" and "Changsha Xiangcun Gansidui," two streamers on our platforms, initiated lucky draws during their streaming sessions and then repurchased gifts from winning users offline, in order to attract and incentivize users to participate in the lucky draw on our platform, in violation of the rule and policy of our platform. **Such activities are explicitly forbidden by our platform** and may be suspected of being involved in illegal gambling activities by these streamers.

(Emphasis added.)

109.   The statements referenced above were materially false and misleading because they failed to disclose that DouYu was secretly aiding and abetting streamers on its platform to organize viewer gambling, thereby violating Chinese law. DouYu failed to disclose that, contrary to its statement that "[gambling] activities are explicitly forbidden by our platform," DouYu secretly devised a script for its streamers and directed them to transfer cash prizes through third-party channels to bypass the law. By actively engaging in the organization of gambling activities disguised as innocent lucky draws, DouYu's statement that "[w]e do not believe" those activities were illegal was materially false.

110.   The 2021 Annual Report also states, in the relevant part, that

We endeavor to eliminate illicit content from our platform. We have made substantial investments in resources to monitor content that users post on our platform and the way in which our users engage with each other through our platform. **We use a variety of methods to ensure our platform remains a healthy and positive experience for our users. … Although we employ these methods to filter content**

46

**posted on our platform**, we cannot be sure that our internal content control efforts will be sufficient to remove all content that may be viewed as indecent or otherwise non-compliant with PRC law and regulations.

\*        \*        \*

**Content Monitoring System**
Our livestreaming platform contains real-time content, which **we monitor to maintain a healthy ecosystem and ensure compliance with PRC laws and regulations.** We have developed a comprehensive system to monitor content on our platform and filter inappropriate and illegal content and content that may infringe on the intellectual property rights of third parties.

(Emphasis added.)

111.    The statements referenced above were materially false and misleading because they contradicted the facts that DouYu was secretly aiding and abetting streamers on its platform to organize viewer gambling, thereby violating Chinese law. DouYu secretly devised a script for its streamers and directed them to transfer cash prizes through third-party channels to bypass the law. By actively engaging in the organization of gambling activities disguised as innocent lucky draws, DouYu's above statements that it "monitor[ed]" to ensure "compliance" and "endeavor[ed] to eliminate illicit content" were materially false.

**2022 Q1 Earnings Call**

112.    On May 18, 2022, DouYu conducted the earnings call for 2022 Q1. During the call, Defendant Chen stated that,

As we continue to develop the paying behavior of our core users and enhance engagements with more casual and mid-core gamers, through **sustainable operating strategies and promotional campaigns**, that are customized based on the preference of different groups. Our paying users, they are able to sustain a stable pay user base and a healthy range for our ARPU.

(Emphasis added.)

113.    These statements were materially false and misleading because Defendants failed to disclose that the "strategies" and "campaigns" included DouYu's secret aiding and abetting of streamers on its platform to organize viewer gambling, thereby violating Chinese law. DouYu secretly devised a script for its streamers and directed them to transfer cash prizes through third-party channels to bypass the law. Defendants failed to disclose that the "competitive strengths" of the illegal strategy employed by DouYu were illegal and unsustainable, subject DouYu to a material risk of significant penalties from Chinese authorities.

**2022 Q3 Earnings Call**

114.    On November 21, 2022, DouYu conducted the earnings call for 2022 Q3. During the call, Defendant Chen stated that,

However, our overall revenue remained stable on a quarterly basis, demonstrating **the high stickiness of our co-paying users** with more rational and **sustainable spending behaviors**. More importantly, starting in the second quarter, we made structural adjustments to improve our revenue quality. We enhanced the quality of virtual gifting revenue and made progress in improving our non-virtual gifting revenue.
(Emphasis added.)

48

115.  These statements were materially false and misleading because Defendants failed to disclose that the "high stickiness" of paying users resulted from the illegal gambling activities organized by DouYu and its streamers. Defendants failed to disclose that such stickiness and spending behaviors were unsustainable because Chinese authorities would reasonably likely force DouYu to stop such practices.

**2022 Annual Report**

116.  On April 25, 2023, DouYu filed its 2022 Annual Report. Attached to the 2022 Annual Report were signed certifications pursuant to SOX signed by Defendants Chen and Su attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

117.  The 2022 Annual Report stated, in relevant part, that

[T]here are online lucky draws, raffles, interactive patterns and other similar activities conducted on our platform to promote user engagement, which involve virtual currencies (such as Yuchi). The prize of such activities can only be used to purchase virtual gifts or to give to streamers as rewards on our platform. **We do not believe such activities are specifically prohibited under PRC laws and regulations.** … It was reported that "Shanshanjiu Huwai" and "Changsha Xiangcun Gansidui," two streamers on our platforms, initiated lucky draws during their streaming sessions and then repurchased gifts from winning users offline, in order to attract and incentivize users to participate in the lucky draw on our platform, **in violation of the rule and policy of our platform. Such activities are explicitly forbidden by our platform** and may be suspected of being involved in illegal gambling activities by these streamers.

(Emphasis added.)

118.    The statements referenced above were materially false and misleading because they failed to disclose that DouYu was secretly aiding and abetting streamers on its platform to organize viewer gambling, thereby violating Chinese law. DouYu failed to disclose that, contrary to its statement that "[gambling] activities are explicitly forbidden by our platform," DouYu secretly devised a script for its streamers and directed them to transfer cash prizes through third-party channels to bypass the law. By actively engaging in the organization of gambling activities disguised as innocent lucky draws, DouYu's statement that "[w]e do not believe" those activities were illegal was materially false.

119.    The 2022 Annual Report also states, in the relevant part, that

> **We endeavor to eliminate illicit content from our platform**. We have made substantial investments in resources to monitor content that users post on our platform and the way in which our users engage with each other through our platform. **We use a variety of methods to ensure our platform remains a healthy and positive experience for our users**. … Although we employ these methods to filter content posted on our platform, we cannot be sure that our internal content control efforts will be sufficient to remove all content that may be viewed as indecent or otherwise non-compliant with PRC law and regulations.
>
> \*        \*        \*
>
> **Content Monitoring System**
>
> Our livestreaming platform contains real-time content, which **we monitor to maintain a healthy ecosystem and ensure compliance with PRC laws and regulations.** We have developed a comprehensive

system to monitor content on our platform and filter inappropriate and illegal content and content that may infringe on the intellectual property rights of third parties.

(Emphasis added.)

120.  The statements referenced above were materially false and misleading because they contradicted the facts that DouYu was secretly aiding and abetting streamers on its platform to organize viewer gambling, thereby violating Chinese law. DouYu secretly devised a script for its streamers and directed them to transfer cash prizes through third-party channels to bypass the law. By actively engaging in the organization of gambling activities disguised as innocent lucky draws, DouYu's above statements that it "monitor[ed]" to ensure "compliance" and "endeavor[ed] to eliminate illicit content" were materially false.

121.  Additionally, the statements referenced above were materially false and misleading because Defendants failed to disclose that contrary to its alleged efforts to "eliminate illicit content", in March 2023, DouYu loosened its internal regulation and monitoring on pornography and actively encouraged its streamers to entice users to pay through explicit language and behavior; DouYu actively promoted such pornographic content to users in order to boost its revenue, violating Chinese law.

122.  The 2022 Annual Report also states, in the relevant part, that,

**We have adopted various actions and internal policies** to manage our streamers to comply with the Code of Conduct for Live-Streamers or other applicable laws and regulations, including **taking special actions to correct the misconduct of streamers from time to time,**

**strengthening the content monitoring, screening illicit and/or inappropriate content** and charging penalties to streamers who has violated certain provisions of the Code of Conduct, **strengthening the internal compliance review of products, services and streamers** in respect of taxation and other laws, in order to avoid the Company's and streamers' violations of the Code of Conduct and other applicable laws and regulations.

(Emphasis added.)

123.   The statements referenced above were materially false and misleading because they contradicted the facts that DouYu was secretly aiding and abetting streamers on its platform to organize viewer gambling, thereby violating Chinese law. DouYu secretly devised a script for its streamers and directed them to transfer cash prizes through third-party channels to bypass the law. By actively engaging in the organization of gambling activities disguised as innocent lucky draws, DouYu's above statements describing the various actions and policies to combat misconduct and ensure compliance were materially false.

124.   Additionally, the statements referenced above were materially false and misleading because Defendants failed to disclose that contrary to its alleged efforts to combat misconduct and ensure compliance, in March 2023, DouYu loosened its internal regulation and monitoring on pornography and actively encouraged its streamers to entice users to pay through explicit language and behavior; DouYu actively promoted such pornographic contents to users in order to boost its revenue, violating Chinese law.

**2023 Q2 Earnings Call**

125.   On August 14, 2023, DouYu conducted the earnings call for 2023 Q2. During the call, Lei Zhang, an analyst from BofA Securities inquired about "[a]ny updates on" "a regulator on-site review in May" and "the impact to our business". Defendant Chen responded that,

> During the one month on-site inspection by the Hubei Brew of China's Cyberspace Administration Working Group, the working group provided supervision and guidance on various matters. Our team was in complete cooperation and **readily represented any company information that was requested, such as our policies and procedures for content review and our content approval review process.** We also took this opportunity to continue to enhance the capabilities and skill sets of DouYu's content-related support team. During the inspection period, our business operations continued as [euro]. After the conclusion of the inspection, we have continued to make improvements to relevant rules and procedures across our platform. More specifically, as we discussed earlier, we improved our content management procedures, particularly on those related to content monitoring, review and approval. We are now back in our normal internal supervision mode, which has been strengthened by the continued improvements we have made to our internal progresses.

(Emphasis added.)

126.   These statements were materially false and misleading because Defendant Chen failed to disclose that Chinese authorities were still reviewing DouYu's submissions at the time, posing a material risk that the Chinese authorities could discover additional evidence regarding DouYu's violations during the review process and therefore take further material regulatory actions against DouYu. Within two months after Defendant Chen's statements, he was detained by the Chinese

authorities for illegal gambling and pornography on DouYu.

**THE TRUTH SLOWLY MATERIALIZES AND EMERGES**

127.   On March 29, 2022, after market hours, *The Wall Street Journal* released an article entitled "China Plans New Restrictions in Its Booming Live-Streaming Sector", which warned of coming regulatory hurdles faced by DouYu and others. The article stated, in pertinent part, the following,

> **China is planning new curbs on the country's $30 billion live-streaming industry**, according to people familiar with the matter, renewing a regulatory campaign aimed at reining in technology companies and exerting greater influence over the content consumed by its young people.
>
> *       *       *
>
> Any attempts to regulate this booming segment of the online world would follow in the footsteps of other efforts to clamp down and clean up behavior on the internet, particularly for younger people.
>
> *       *       *
>
> Beijing has grown concerned about the rapid and relatively unregulated growth of the live-streaming sector, which frequently features sexualized content and has generated complaints of fraud and deceptive behavior.

(Emphasis added).

128.   On this news, the price of DouYu ADSs declined $0.15 per ADS, or 6.35%, to close at $2.21 on March 30, 2022 and continued to decline another $0.13 per ADS, or 5.88%, to close at $2.08 per ADS on March 31, 2022.

129.   On April 26, 2022, during market hours, an article entitled "DouYu Facing the Tightening Noose of Regulations" was posted on Seeking Alpha, a

market-oriented website, which warned about steps the Chinese government was taking due to societal fears surrounding unhealthy content offered by platform companies, including DouYu, among other issues. It stated, in pertinent part,

> Although perceived as highly promising, with a market of the world's largest gaming population, the Chinese e-game market has been suffering as a result of widespread government regulations in the form of a crackdown, in mid-2021. The move coincided with the Chinese government's so-called 'social intervention' it had undertaken to tackle the growing addiction to video games among minors in the country.[. . .]
>
> *     *     *
>
> These circumstances add to the red flags surrounding DOYU and reinforce why investors must sell this stock, which is undergoing a downward spiral not expected to slow down. In addition to the regulatory hurdles it faces, which are delivering a clear blow to its financial performance, the company is likely to simultaneously struggle against a worsening macroeconomic crisis.
>
> DOYU is a stock that holds several red flags, as a result of external circumstances. **With the regulatory crackdown on the Chinese gaming industry by authorities, as well as a state intervention to prevent a merger**, **the stock is increasingly struggling to create value for its shareholders**. This is evident in its deteriorating profit trend, despite increasing revenues. Moreover, the stock holds a risky profile which suggests overvaluation, in comparison to similarly-sized Chinese tech stocks.
>
> (Emphasis added).

130.    On this news, the price of DouYu ADSs declined $0.11 per ADS, or 6.74%, to close at $1.52 per ADS on April 26, 2022.

131.    On February 27, 2023, the CAC released the outcomes of the 2022 anti-

pornography and anti-illegal publications campaign,[19] specifically highlighting the violations of DouYu and a few other platforms. The announcement disclosed, in that relevant part, that,

> In response to the issues of disseminating harmful and inappropriate content such as explicit material, vulgar and sensational content, violent abuse, and encouraging excessive tipping on platforms like Douyin, Kuaishou, Bilibili, Huajiao, **DouYu**, and Huya, [various CAC offices] lawfully interviewed [the companies], mandating rectification within a specified period, implemented strict measures against those responsible, and administered penalties, including fines.

***

> In the next step, the Cyberspace Administration of China will conscientiously implement the goal and task of "improving the comprehensive network governance system and promoting the formation of a good network ecology" proposed by the 20th National Congress of the Communist Party of China. In order to solve the problem, **we will continue to increase the crackdown** on violations of laws and regulations, continue to do a good job in the work of "sweeping pornographic and illegal activities" online, and effectively safeguard the people's online cultural rights and interests.

> (Emphasis added).

132.   On this news, the price of DouYu ADS declined by \$0.07 per ADS, or 5.3%, to close at \$1.25 on February 28, 2023.

133.   On April 29, 2023, E.T., the CAC announced the outcomes of the "Clear" series special action for the first quarter of 2023.[20] The announcement

---

[19] http://www.cac.gov.cn/2023-02/27/c_1679136693877153.htm
[20] http://www.cac.gov.cn/2023-04/30/c_1684501637698699.htm

disclosed, in that relevant part, that:

> In response to inadequate fulfillment of primary responsibilities by online platforms such as Baidu, Sina Weibo, **DouYu**, and Douban, and their failure to fulfill obligations in managing user-generated content, resulting in the dissemination of harmful information such as explicit content, feudal superstitions, solicitation of prostitution, gambling promotion, and high-interest lending, the Cyberspace Administration of China has directed the relevant local offices to have lawfully interviewed the principal individuals who were in charge from the respective websites, ordering them to rectify the issues within a specified timeframe and tackle related user accounts, imposing strict measures on those who were responsible, and administering administrative penalties involving fines.

(Emphasis added.)

134.   Notably, DouYu was the only company that the CAC mentioned twice for content violations from the beginning of 2023 to April 29, 2023, showing that DouYu had failed to fully rectify its violations according to the orders, allowing the violations to persist. On this news, the price of DouYu ADS declined by $0.03 per ADS, or 2.63%, to close at $1.11 on May 2, 2023.

135.   On May 8, 2023, before the market opened, the CAC announced that "in response to the severe ecological issues, including pornography and vulgarity, on the DouYu platform, on May 8, the Cyberspace Administration of China directed the Internet Information Office of Hubei Province to deploy a working group to the DouYu platform for a one-month concentrated rectification and supervision." Following this news, DouYu's ADS price immediately plunged by 14% decline during pre-market hours and eventually fell by 2.7% on May 8, 2023.

136.   On May 9, 2023, before the market opened, DouYu filed a current report on Form 6-K with the SEC, acknowledging that the "CAC has sent an inspection team to the Company due to certain alleged violations of content rules and regulations on its platform. The CAC team is expected to conduct a one-month on-site inspection of the Company's content platform." DouYu further stated that it would cooperate with the CAC. Also on May 9, 2023, Bloomberg published an article entitled "China Business Network Tencent-Backed DouYu Drops After China's Cybersecurity Watchdog Looks Into Vulgar Content", revealing that the CAC had previously "summoned the bosses of online platforms such as …., and Douban about transgressions, like the spreading of pornography, redirecting visitors to gambling…, caused by the platforms' failure to manage user-posted content." The Bloomberg article also reported that the CAC specified a timeframe for the companies to rectify the "transgressions." The market continued to digest the series of news and understand the severity of DouYu's violations. Investors had begun to know that, given DouYu's purported commitment to cooperation, the cessation of illicit activities on DouYu's platform would eliminate a material portion of DouYu's revenue. The anticipation of such consequences prompted a sell-off of the Company's ADSs. Therefore, the Company's share price fell $0.03 or 2.78% on May 9, 2023, and continued to fall another $0.098 per ADR, or 9.33%, on May 10, 2023.

137.   On November 5, 2023, 36kr.com reported, and other news outlets subsequently corroborated, that Defendant Chen had been under Chinese authorities' detention for over three weeks. His detention was promptly linked to the illicit activities of DouYu, subject of this Amended Complaint.[21] The market responded strongly to this news, causing DouYu's ADS price to plummet by 10.04% with a huge trading volume on November 6, 2023. Also on November 6, 2023, the Financial Times[22] covered Chen's detention, citing a source close to Defendant Chen who stated, "[h]e was taken away by the public security department for investigation related to the pornographic and gambling content on the site."

138.   On November 21, 2023, before the market opened, DouYu published a press release, revealing for the first time Defendant Chen's official arrest by the Chinese authorities. Specifically, DouYu disclosed that it "was informed on November 20, 2023" that Defendant Chen "was arrested by the Chengdu police on or about November 16, 2023." DouYu further stated that Defendant Chen's "ongoing detention and any subsequent related legal proceedings and enforcement actions against the parties involved may have a material adverse impact on the Company's reputation, business and results of operations."

---

[21] https://36kr.com/p/2506198364579713
[22] https://www.ft.com/content/63a0923b-a98e-4433-bc3a-9091dca3dcc5?FTCamp=engage/CAPI/desktopapp/Channel_Bloomberg//B2B

139.   On November 22, 2023, the Bureau of Public Security in Chengdu Dujiangyan City, a Chinese government authority equivalent to the police in the U.S., confirmed that Defendant Chen had been officially arrested for the crime of operating a gambling establishment. Specifically, the Bureau announced that, it, "through investigation, has ascertained that [Defendant Chen] (male, 39 years old) is suspected of the crime of operating a gambling establishment. Currently, [Defendant Chen] has been arrested according to law. The case is under further investigation."

140.   The above disclosures confirmed that Defendant Chen had indeed been detained by the Chinese authorities before November 20, 2023. They also evidence that in November 2023, the Chinese authorities had decided to proceed with and escalate its prosecution of Defendant Chen to an "arrest" which is a materially more severe compulsory criminal measure taken by the Chinese authorities than "detention" under Chinese criminal law.

141.   According to the Criminal Procedural Law of China, the police have the authority to detain an individual solely upon their own decision if such individual is caught in the act of committing a crime or is suspected of a serious crime. However, the Article 81 of the Criminal Procedural law provides that the police can only make an arrest when evidence proves the commission of a criminal act, the possibility of a sentence of no-less-than-one-year imprisonment, and when methods such as

surveillance or residential surveillance are insufficient to prevent the occurrence of public danger. In addition, one of the following conditions must be satisfied:

(1) The individual may commit further crimes;

(2) The individual poses actual threats to national security, public safety, or social order;

(3) The individual may tamper with evidence, forge evidence, interfere with witness testimony, or collude in giving false testimony;

(4) The individual may retaliate against victims, informants, or accusers;

(5) The individual attempts suicide or escape.

142.    In contrast to detention, which can be based solely on police discretion, pursuant to the Criminal Procedural Law, the police must seek prior approval from the People's Procuratorate or the court based on a request for arrest supported by case files, materials, and evidence before arresting an individual. When considering an arrest, the People's Procuratorate or the court must take into account factors such as the nature and circumstances of the suspected crime, confession, and repentance to determine the likelihood of social danger. Additionally, if evidence proves that the individual under consideration for arrest has committed a criminal act and (i) may be sentenced to imprisonment for no less than ten years, or (ii) may be sentenced to imprisonment for one year or longer, and has previously intentionally committed a crime or has an unknown identity, the individual shall be arrested.

143.   Moreover, according to Article 91 of the Criminal Procedure Law of China, although the police must decide whether to request the official arrest of a regular suspect within three days, the police can detain a "significant suspect involved in roaming, committing multiple crimes, or engaging in collusion" for up to 30 days before formally requesting approval for an arrest.

144.   Therefore, given the fact that Defendant Chen had been detained for more than three days since October 2023 before the police officially arrested him, Defendant Chen was indisputably considered a "significant suspect" who has committed "multiple crimes or engaged in collusion" under Chinese law. Additionally, Defendant Chen's official arrest demonstrates that the Chinese authorities had evidence (i) proving Defendant Chen's engagement in the crime of operating a gambling establishment to warrant his official arrest under Chinese law, and (ii) also reasonably likely subjecting him to imprisonment or even more severe criminal penalties.

145.   The market reacted strongly to the above revelations.  On November 21, 2023, DouYu's ADS price fell by $0.57 per ADS or 5.93%, followed by a further decrease of $0.02 per ADS or 0.22% on November 22, 2023.

146.   Between November 25 and 27, 2023, the media unveiled further details regarding Defendants DouYu and Chen's involvement in operating a gambling den.

147.   On November 25, 2023, Yahoo Games published an article titled,

"Chinese Live-Streaming Platform CEO Arrested for Gambling and Money Laundering; 'League of Legends' Pro Player Flees to South Korea to Avoid the Whirlwind." The article disclosed that Defendant Chen's criminal acts related to gambling on DouYu involved racketeering activities that originated from fraudulent schemes in northern Myanmar.

148.    On November 27, 2023, before the market opened, Sohu released an article titled, "Involvement in Billions? DouYu Suspected of Assisting in Money Laundering for Telecom Fraud in Northern Myanmar, Also Linked to Gambling and Pornography." The Sohu article detailed how DouYu and Defendant Chen facilitated money laundering for fraud schemes in northern Myanmar through gambling operations on the DouYu platform. The article reported that fraudsters in northern Myanmar laundered money by gifting funds to streamers on DouYu. Subsequently, DouYu would redistribute the gifted funds between the fraud groups, DouYu, and the participating streamers, with a distribution ratio of 7:1.5:1.5. The whistleblower informed Sohu that initially, some DouYu streamers refused to participate in the money laundering scheme but were coerced into compliance. The article further stated, "[d]ue to the direct involvement of the official DouYu platform," many streamers were forced to participate in the money laundering "under the platform's coercion."

149.    On this news, DouYu ADS price dropped $0.077 per ADS or 8.7% on

November 27, 2023, and dropped another $0.36/ ADS, or 4.43%, on November 28, 2023.

150.   Defendant Chen is currently still under arrest. According to DouYu's annual reports during the Class Period, DouYu, "[i]n particular, [] rel[ies] on the expertise, experience and vision of Mr. Shaojie Chen." If Defendant Chen is absent, DouYu "might not be able to replace [him] easily, in a timely manner, or at all."

151.   As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's ADSs, Plaintiffs and other Class members have suffered significant losses and damages.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

152.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who purchased DouYu ADS publicly traded on the Nasdaq during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the present and former officers and directors of the Company and their immediate families and their legal representatives, heirs, successors or assigns and any entity in which such present and former officers and directors have or had a controlling interest, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.  Excluded from this Class

are those who purchased the Company securities on private transactions and/or private exchanges.

153.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, DouYu ADSs were actively traded on the Nasdaq. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds, if not thousands of members in the proposed Class.

154.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

155.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

156.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of the Company;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused the Company to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of DouYu's ADSs during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

157.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it

impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

158. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- DouYu ADSs met the requirements for listing, and were listed and actively traded on the Nasdaq, an efficient market;

- As a public issuer, the Company filed public reports;

- the Company communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- the Company's ADSs were liquid and traded with moderate to heavy volume during the Class Period; and

- the Company was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

159. Based on the foregoing, the market for the Company ADSs promptly digested current information regarding the Company from all publicly available

sources and reflected such information in the prices of the common units, and Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

160.   Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## COUNT I
**For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder Against All Defendants**

161.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

162.   This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

163.   During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order

to make the statements made, in light of the circumstances under which they were made, not misleading.

164.   Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of the Company's ADSs during the Class Period.

165.   Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control

over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

166.    Individual Defendants, who are or were senior executives and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other DouYu personnel to members of the investing public, including Plaintiffs and the Class.

167.    As a result of the foregoing, the market price of DouYu ADSs was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of DouYu ADSs during the Class Period in purchasing DouYu ADSs at prices that were artificially inflated as a result of Defendants' false and misleading statements.

168.    Had Plaintiffs and the other members of the Class been aware that the market price of DouYu ADSs had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which

Defendants did not disclose, they would not have purchased Company ADSs at the artificially inflated prices that they did, or at all.

169.    As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

170.    By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchase of DouYu ADSs during the Class Period.

## COUNT II
### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

171.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

172.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the DouYu's misstatements or omissions on the Company's business, operations and financial performance.

173.    As officers of a public business, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's

financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

174.   Because of their positions of control and authority as senior executives and/or directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of DouYu's ADSs.

175.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, on behalf of himself and the Class, pray for judgment and relief as follows:

(a)    declaring this action to be a proper class action, designating Plaintiffs as Lead Plaintiffs and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiffs' co-counsel as Co-Lead Counsel for the class;

(b)    awarding damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, together with interest thereon;

(c)    awarding Plaintiffs and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    awarding Plaintiffs and other members of the Class such other and further relief as the Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiffs hereby demand a trial by jury.

Dated: April 4, 2024                         **THE ROSEN LAW FIRM, P.A**

<u>/s/ Laurence M. Rosen</u>
Laurence M. Rosen
Jing Chen
One Gateway Center, Suite 2600
Newark, NJ 07102
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com
          jchen@rosenlegal.com

Phillip Kim
275 Madison Avenue, 40th Floor
New York, NY 10016
Tel: (212) 686-1060

Fax: (212) 202-3827
Email: pkim@rosenlegal.com

**GLANCY PRONGAY &
MURRAY LLP**
Casey Sadler
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Tel: (310) 201-9150
Fax: (310) 201-9160
Email: csadler@glancylaw.com

*Co-Lead Counsel for Plaintiffs*

**LAW OFFICES OF HOWARD G.
SMITH**
Howard G. Smith
3070 Bristol Pike, Suite 112
Bensalem PA 19020
Telephone: (215) 638-4847
Facsimile: (215) 638-4867

*Additional Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on April 4, 2024, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

/s/ Laurence M. Rosen