## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| DAVID RIGO FERNANDEZ, individually and on behalf of all others similarly situated,<br><br>                              Plaintiff,<br><br>           v.<br><br>DOUYU INTERNATIONAL HOLDINGS LIMITED, SHAOJIE CHEN, AND MINGMING SU,<br>                              Defendants. | Case No. 2:23-cv-03161-SDA<br>*Document Filed Electronically*<br><br>CLASS ACTION<br><br>Motion Day: August 18, 2025<br><br>Hon. Stacey D. Adams, U.S.M.J. |

**JOINT DECLARATION OF PHILLIP KIM AND CASEY E. SADLER IN SUPPORT OF: (I) LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION; AND (II) LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION <u>EXPENSES</u>**

**TABLE OF EXHIBITS TO DECLARATION**

| EXHIBIT | TITLE |
|---|---|
| 1 | Declaration of Sarah Evans Concerning: (A) Emailing and Mailing of Notice; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion and Objections |
| 2 | Declaration of Joseph D. Cohen, Esq. in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses Filed on Behalf of Glancy Prongay & Murray LLP |
| 3 | Declaration of Phillip Kim, Esq. in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses Filed on Behalf of The Rosen Law Firm, P.A. |
| 4 | Declaration of Raphael Seiler in Support of: (1) Lead Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation; and (2) Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses ("Seiler Declaration") |
| 5 | Declaration of Pedro Reyes in Support of: (1) Lead Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation; and (2) Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses ("Reyes Declaration") |
| 6 | Excerpts from Edward Flores and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2024 Full-Year Review* (NERA Jan. 22, 2025) ("NERA Report") |
| 7 | Chart of Select Third Circuit Cases with Settlements at least $1,000,000 and awarded Fee Awards of at least 33% |
| 8 | Table of Peer Law Firm Billing Rates |
| 9 | *Pepe v. Cocrystal Pharma, Inc., et al.,* Case No. 2:18-cv-14901-KM-JBC, ECF No. 86 (D.N.J. Dec. 16, 2020) |
| 10 | *Sun v. Han et al.*, No. 2:15-cv-00703-JMV-MF, ECF No. 77 (D.N.J. Mar. 6, 2018) |
| 11 | *Andavarapu v. iBio, Inc. et al.,* No. 1:14-cv-01343-RGA, ECF No. 69 (D. Del. Apr. 21, 2016) |
| 12 | *In re Virgin Mobile USA IPO Litig.*, No. 07-cv-5619, ECF No. 146 (D.N.J. Dec. 8, 2010) |
| 13 | *San Antonio Fire and Police Pension Fund et al v. Dole Food Company Inc. et al*, No. 1:15-cv-1140, ECF No. 100 (D. Del. Jul. 18, 2017) |

i

**TABLE OF CONTENTS**

I.    OVERVIEW OF THE LITIGATION AND THE SETTLEMENT ..................2

II.   PROSECUTION OF THE ACTION ................................................................7

   A.   Commencement of the Action and Appointment of Lead Plaintiffs and
        Lead Counsel ...........................................................................................7

   B.   The Comprehensive Investigation and Preparation of the FAC and SAC
        ...................................................................................................................8

   C.   Defendants' Motion to Dismiss and the Court's Order Thereon;
        Plaintiffs' Subsequent Amendments ........................................................9

   D.   Settlement Negotiations and Preliminary Approval.................................10

III.  THE RISKS OF CONTINUED LITIGATION ................................................12

   A.   Risks Faced in Obtaining and Maintaining Class Action Status...................13

   B.   Challenges to Obtaining Discovery.................................................................14

   C.   Risks to Proving Liability................................................................................16

   D.   Risks to Proving Loss Causation And Damages ...........................................17

   E.   Other Risks, Including Trial, Appeals, and Ability to Collect a
        Judgment........................................................................................................19

      1.   Risks of Litigation Against China-Based Defendants ...............................19

      2.   Other Risks in Protracted Litigation .........................................................24

   F.   The Settlement is Reasonable in Light of Potential Recovery in the
        Action...............................................................................................................25

IV.  LEAD PLAINTIFFS' COMPLIANCE WITH THE COURT'S
     PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF
     THE NOTICE .....................................................................................................26

V.    ALLOCATION OF THE NET PROCEEDS OF THE SETTLEMENT.........30

VI.   LEAD COUNSEL'S REQUEST FOR ATTORNEYS' FEES AND
      REIMBURSEMENT OF LITIGATION EXPENSES...................................33

  A.   The Fee Application .................................................................................35

    1.   The Excellent Outcome Achieved is the Result of Significant Time
         and Labor That Lead Counsel Devoted to the Action ...............................36

    2.   The Magnitude and Complexity of the Action ...........................................37

    3.   The Significant Risks Borne by Lead Counsel............................................38

    4.   The Quality of Representation, Including the Result Obtained, the
         Experience and Expertise of Lead Counsel, and the Standing and
         Caliber of Defendants' Counsel..................................................................39

    5.   The Requested Fee in Relation to the Settlement ......................................40

    6.   The Reaction of the Settlement Class Supports Lead Counsel's Fee
         Request.........................................................................................................40

    7.   Lead Plaintiffs Support Lead Counsel's Fee Request ...............................41

  B.   The Requested Litigation Expenses Reimbursement is Fair and
       Reasonable...................................................................................................41

VII. CONCLUSION ...............................................................................................44

iii

We, Phillip Kim and Casey E. Sadler, hereby jointly declare as follows:[1]

1.　　I, Phillip Kim, am an attorney licensed to practice law in the State of New York and admitted *pro hac vice* in this action. I am a partner at The Rosen Law Firm, P.A. ("RLF"), Court-appointed Co-Lead Counsel for Lead Plaintiffs Pedro Reyes and Raphael Seiler ("Lead Plaintiffs" or "Plaintiffs") in the above-captioned action. I have personal knowledge of the facts set forth herein and, if called upon, could and would testify thereto.

2.　　I, Casey Sadler, am an attorney licensed to practice in the State of California and I am admitted *pro hac vice* in this action. I am a partner at the law firm of Glancy Prongay & Murray LLP ("GPM"), Court-appointed Co-Lead Counsel for Lead Plaintiffs. I have personal knowledge of the facts set forth herein and, if called upon, could and would testify thereto.

3.　　RLF and GPM are collectively referred to as "Lead Counsel" or "Co-Lead Counsel."

4.　　We respectfully submit this declaration in support of Lead Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation and the concurrently filed memorandum in support thereof ("Final Approval Memorandum"). As set forth in the Final Approval Memorandum, Lead Plaintiffs

---

[1] If not otherwise specified, capitalized terms herein have the meaning set forth in the Stipulation of Settlement ("Stipulation", ECF No. 61).

seek final approval of the $2,250,000 settlement (the "Settlement") that the Court preliminarily approved by Order dated March 31, 2025 (the "Preliminary Approval Order," ECF No. 79), as well as approval of the proposed Plan of Allocation of the Net Settlement Fund to eligible Settlement Class Members.

5.     We also respectfully submit this declaration in support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses and the concurrently filed memorandum of support thereof ("Fee Memorandum"). As set forth in the Fee Memorandum, Lead Counsel seeks an award of attorneys' fees in the amount of 33⅓% of the Settlement Fund (which, by definition, includes interest accrued thereon), reimbursement of Lead Counsel's total out-of-pocket litigation costs in the amount of $53,270.97, and a total of $10,000 to Lead Plaintiffs, pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA") for their costs, including lost wages, incurred in connection with their representation of the Settlement Class.[2]

## I.     OVERVIEW OF THE LITIGATION AND THE SETTLEMENT

6.     The Settlement now before the Court provides for the resolution of all claims in the Action in exchange for a non-reversionary cash payment of $2,250,000.

---

[2] As used herein, the term "Litigation Expenses" includes both the costs and expenses incurred by Lead Counsel in connection with commencing, prosecuting and settling the Action, and the proposed PSLRA award to Lead Plaintiffs.

As detailed herein, Lead Plaintiffs and Lead Counsel submit that the proposed Settlement represents a highly favorable result for the Settlement Class considering the posture of the Action, as well as the significant risks to overcome remaining in the Action. Lead Plaintiffs' damages consultant estimates that if Lead Plaintiffs had *fully prevailed* on their claims at the motion to dismiss, summary judgment, and after a jury trial, if the Court certified the proposed class, and if the Court and jury accepted Lead Plaintiffs' damages theory—*i.e.*, Lead Plaintiffs' *best-case scenario*—the total maximum damages would be approximately $9.2 million. Under this best-case scenario, the $2.25 million Settlement Amount represents approximately 24.5% of the total maximum damages potentially available in this Action. Of course, Defendants had advanced, and would continue to advance, serious arguments with respect to liability, loss causation, and damages. If any of these arguments were accepted, the putative class's potential recovery would have been substantially reduced or completely eliminated.

7.      As explained in greater detail herein, this Settlement was reached only after comprehensive inquiry into the merits of the claims alleged and the likely damages that could be recovered by the Settlement Class. Among other things, Lead Counsel:

- drafted the initial complaint in the Action;

- drafted motions for the appointment of lead plaintiffs pursuant to the PSLRA, and negotiated a stipulation for the appointment of co-lead plaintiffs and co-lead counsel that the Court subsequently entered;

- conducted a comprehensive investigation of the claims asserted in the Action, which included, among other things: (a) reviewing and analyzing (i) DouYu's U.S. Securities and Exchange Commission ("SEC") filings; (ii) DouYu's public filings with Chinese regulatory agencies and its local provincial offices; (iii) public reports, blog posts, research reports prepared by securities and financial analysts, news and wire articles, and other information available on the internet concerning DouYu, including many published in Mandarin Chinese; (iv) DouYu's quarterly and annual earnings call transcripts; (v) announcements by the Cyberspace Administration of China (the "CAC"); (vi) a publication by Chengdu Intermediate People's Court regarding the outcome of the Shanshanjiu Huwai case; (vii) court filings in a previous securities litigation matter in the U.S. against DouYu; and (vii) other publicly available material concerning DouYu and related entities; (b) retaining and working with a bilingual private investigator who, *inter alia*: (i) conducted numerous interviews of former DouYu employees and other sources of potentially relevant information; (ii) obtained information concerning "Changsha Xiangcun Gansidui" and "Shanshanjiu Huwai," two top streamer groups that were explicitly mentioned in DouYu's 2020–2022 annual reports filed with the SEC; and (iii) identified administrative penalties received by Wuhan DouYu Network Technology Co., Ltd., DouYu's primary operating subsidiary; (c) having relevant documents translated from Chinese to English; and (d) consulting with experts in the fields of loss causation and damages;

- utilized the comprehensive investigation and additional research to draft and file the 67-page, 159-paragraph, Amended Class Action Complaint for Violations of the Federal Securities Laws ("FAC"), which asserted violations of the Securities Exchange Act of 1934 (the "Exchange Act") (ECF No. 39);

- researched, drafted, and filed an opposition to Defendants' pre-motion letter seeking permission to file a motion to dismiss the FAC;

- reviewed Defendants' motion to dismiss the FAC, continued their investigation, and, in light of the discovery of additional facts, entered into a stipulation with Defendants providing for the filing of a second amended

4

complaint, which the Court granted;

- drafted and filed the 73-page, 175-paragraph, Second Amended Class Action Complaint for Violations of the Federal Securities Laws ("SAC"), which asserted violations of the Exchange Act; and

- researched, drafted, and filed an opposition to Defendants' pre-motion letter seeking permission to file a motion to dismiss the SAC.

8.    Based on the foregoing efforts, Lead Plaintiffs and Lead Counsel were well informed on both the strengths and weaknesses of the claims and defenses in the Action. Armed with this knowledge, Lead Counsel engaged in several weeks of arm's-length settlement negotiations with Defendants' Counsel via telephone and email that culminated in the Parties reaching an agreement in principle to settle the Action. Thereafter, Lead Counsel, *inter alia*:

- assisted in the preparation of the Plan of Allocation, which is based on a consulting damages expert report, and ensured that it treated Lead Plaintiffs and all other members of the proposed Settlement Class fairly;

- prepared the initial draft, and negotiated the terms, of the Stipulation (including the exhibits thereto) and the Supplemental Agreement;

- drafted the preliminary approval motion and supporting papers;

- attended the preliminary approval hearing and submitted supplemental papers at the Court's request, including declarations from the Claims Administrator, Lead Plaintiffs' damages expert, the private investigator retained by Lead Counsel, and Lead Counsel, as well as research related to attorneys' fees;

- worked with the Court appointed Claims Administrator to provide notice to the Settlement Class; and

- drafted the final approval motion and supporting papers.

9.    In our opinion, the Settlement confers a substantial immediate benefit to the Settlement Class that is eminently fair, reasonable, and adequate given the

legal hurdles and risks involved in proving liability and damages. The Settlement also avoids the further risk, delay, and expense had this case continued through class certification, discovery, summary judgment, and to trial. Accordingly, Lead Counsel respectfully submits that, under the circumstances, the Settlement is in the best interest of the Settlement Class and should be approved.

10.    In addition to seeking final approval of the Settlement, Lead Plaintiffs seek approval of the proposed Plan of Allocation as fair and reasonable. As discussed in further detail below, Lead Counsel assisted in the preparation of the Plan of Allocation, which is based on the work of Lead Plaintiffs' damages consultant. The Plan of Allocation provides for the distribution of the Net Settlement Fund to Settlement Class Members who submit Claim Forms that are approved for payment by the Court on a *pro rata* basis. Specifically, an Authorized Claimant's *pro rata* share shall be the Authorized Claimant's Recognized Claim divided by the total Recognized Claims of all Authorized Claimants, multiplied by the total amount in the Net Settlement Fund.

11.    Finally, Lead Counsel seeks approval of the request for attorneys' fees and reimbursement of Litigation Expenses as set forth in the Fee Memorandum. As discussed in detail in the accompanying Fee Memorandum, the requested 33⅓% fee is within the range of percentage awards granted by courts in this Circuit in comparable securities class actions. Additionally, the fairness and reasonableness of

6

the request is confirmed by a lodestar cross-check, and warranted in light of the extent and quality of the work performed and the result achieved. Likewise, the requested out-of-pocket litigation costs of $53,270.97 and the requested reimbursements of costs of $5,000 to each Lead Plaintiff (for a total of $10,000), pursuant to the PSLRA are also fair and reasonable. Accordingly, for the reasons set forth in the Fee Memorandum and for the additional reasons set forth herein, Lead Counsel respectfully submits that the request for attorneys' fees and reimbursement of Litigation Expenses be approved.

## II.   PROSECUTION OF THE ACTION

### A.   Commencement of the Action and Appointment of Lead Plaintiffs and Lead Counsel

12.   On June 9, 2023, the class action was initiated, styled as *Fernandez v. DouYu International Holdings, et al.*, Case No. 2:23-cv-03161 (D.N.J.). ECF No. 1.

13.   On August 8, 2023, Seiler and Reyes filed separate motions seeking to be appointed lead plaintiffs and to approve their selection of counsel. ECF Nos. 17, 19. After other movants indicated that they did not oppose Seiler's and Reyes' motions, on August 22, 2023, Seiler and Reyes filed a stipulation seeking appointment as co-lead plaintiffs and approval of co-lead counsel of GPM and RLF. ECF No. 23. On August 24, 2023, Judge Evelyn Padin granted the stipulation, appointing Lead Plaintiffs, and approving their selection of GPM and RLF as Lead Counsel. ECF No. 24.

**B.      The Comprehensive Investigation and Preparation of the FAC and SAC**

14.      In preparation for filing the FAC, Lead Counsel conducted an extensive factual and legal investigation that included, among other things, reviewing and analyzing: (i) DouYu's publicly-filed documents with the SEC; (ii) public reports, research reports prepared by securities and financial analysts, news and wire articles, and other information available online concerning Defendants from both English and Chinese sources; and (iii) investor call transcripts. Lead Plaintiffs also retained a private investigator in China to identify and interview witnesses.[3]

15.      On November 16, 2023, Lead Plaintiffs filed the First Amended Complaint asserting claims against DouYu and individual defendants Shaojie Chen and Mingming Su ("Individual Defendants") on behalf of persons or entities who purchased publicly traded DouYu ADSs between April 30, 2021 and November 5, 2023, inclusive, under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and against the individual defendants Shaojie Chen and Mingming Su under Section 20(a) of the Exchange Act. ECF No. 39.

---

[3] The Court is respectfully referred to the declarations of (i) Plaintiffs' investigator, and (ii) Jing Chen, Esq., both submitted for *in camera* review, pursuant to the Court's November 13, 2024, letter order (ECF No. 75), for a more expansive explanation of the work of the investigator and the investigation performed by Lead Counsel.

**C.     Defendants' Motion to Dismiss and the Court's Order Thereon; Plaintiffs' Subsequent Amendments**

16.     On December 18, 2023, pursuant to Judge Padin's General Pretrial and Trial Procedures, Defendant DouYu filed a letter motion seeking a pre-motion conference regarding its anticipated motion to dismiss the FAC. ECF No. 40. On January 9, 2024, Lead Plaintiffs responded to DouYu's pre-motion conference letter. ECF No. 41. On February 1, 2024, Judge Padin ordered DouYu to file its motion to dismiss pursuant to a previously entered schedule. ECF No. 42.

17.     On March 3, 2024, DouYu filed its motion to dismiss. ECF No. 43.

18.     Instead of opposing the motion to dismiss, on March 22, 2024, Lead Plaintiffs and DouYu filed a stipulation and proposed order seeking to file a second amended complaint. Lead Plaintiffs also proposed a schedule for responses thereto. ECF No. 46. The same day, then Magistrate (now District) Judge Edward S. Kiel granted the stipulation. ECF No. 47.

19.     On April 4, 2024, Lead Plaintiffs filed the operative SAC against Defendants. ECF No. 50. The SAC alleges that DouYu, a China-based online platform that provides gaming and entertainment livestreaming, experienced declining revenues after the Company went public. In an attempt to attract paying users, the SAC alleges that DouYu offered more content, which included gambling and pornography – both of which are prohibited by Chinese law. The SAC asserts that, in violation of the Exchange Act, Defendants made materially misleading

9

statements to the public. Among other things, the SAC alleges that Defendants misrepresented that DouYu: was complying with Chinese laws; was affirmatively trying to eliminate illicit content from its platforms; and had a sustainable operational strategy. The SAC further alleged that the truth began to materialize when the Chinese government began a regulatory crackdown to address illicit content from streaming platforms, and explicitly naming DouYu. With that, DouYu was subjected to a month-long inspection by the CAC. Further, Defendant Chen was arrested by Chinese authorities for the crime of operating a gambling establishment. On this news, the SAC asserts that investors were damaged.

20.     Pursuant to Judge Padin's rules, on May 3, 2024, DouYu filed a letter motion seeking a pre-motion conference regarding its anticipated motion to dismiss the SAC. ECF No. 51. Lead Plaintiffs responded to DouYu's pre-motion conference letter on May 24, 2024. ECF No. 52. On June 12, 2024, Judge Padin entered a text order permitting DouYu to file its motion to dismiss in accordance with the previously filed stipulated schedule. ECF No. 53.

### D.     Settlement Negotiations and Preliminary Approval

21.      On or about May 16, 2024, Lead Plaintiffs sent a settlement demand letter (the "Settlement Demand") to DouYu's counsel. The Settlement Demand laid out Lead Plaintiffs' theories of the case, asserted the strength of their claims, provided their estimate of alleged damages, but expressed Lead Plaintiffs'

willingness to consider a resolution of the Action. Over the next several weeks, counsel for Lead Plaintiffs and DouYu negotiated via telephone and email.

22.   Because the negotiations were ongoing, on July 3, 2024, the Parties requested the Court extend the motion to dismiss briefing by three weeks (ECF No. 54), which Judge Padin granted. ECF No. 55.

23.   Following extensive discussions, the Parties agreed to a settlement in principle.

24.   During the preparation of the settlement documents, Defendants Chen and Su appeared in the Action. As such, all Parties agreed to the Settlement.

25.   Lead Plaintiffs filed the Unopposed Motion for Preliminary Approval of Class Action Settlement and Providing for Notice ("Preliminary Approval Motion") on July 31, 2024. ECF Nos. 61-62.

26.    On September 16, 2024, the Parties appeared at a conference before Magistrate Judge Stacey D. Adams, providing an overview of the Preliminary Approval Motion and agreeing to consent to Judge Adams' jurisdiction over the Action.

27.   On September 17, 2024, the Parties filed the necessary documentation to consent to proceed before Judge Adams (ECF No. 69), which Judge Padin so-ordered the same day. ECF No. 70. As such, the pending Preliminary Approval Motion was then before Judge Adams.

28.    On November 13, 2024, Judge Adams held a hearing on the Preliminary Approval Motion. The Court requested supplemental documentation including a declaration from the Claims Administrator, Strategic Claims Services ("SCS") as well as a sampling of cases involving securities class action settlements where the amount of the settlement was less than $5,000,000 and the fees came from the settlement fund. ECF No. 75. Additionally, the Court requested: a declaration from Lead Plaintiffs' damages expert; a declaration from Lead Plaintiffs' investigator; and a declaration from counsel regarding the investigation involved in this Action (*id.*), each of which were submitted *in camera*.

29.    On December 6, 2024, Lead Plaintiffs provided the Court with the requested supplemental documentation. ECF No. 76, and *in camera*.

30.    On March 31, 2025, the Court entered the Opinion on Motion for Preliminary Approval of Class Action Settlement (ECF No. 78), and the Order Preliminarily Approving Class Action Settlement and Providing for Notice ("Preliminary Approval Order") (ECF No. 79).

## III.    THE RISKS OF CONTINUED LITIGATION

31.    The Settlement provides an immediate and certain benefit to the Settlement Class in the form of a non-reversionary cash payment of $2,250,000. As explained more fully below, there were significant risks that the Settlement Class might recover substantially less than the Settlement Amount—or nothing at all—if

12

the case were to proceed through additional litigation to a jury trial, followed by the inevitable appeals.

### A.    Risks Faced in Obtaining and Maintaining Class Action Status

32.    Should the case proceed past the pleading stage, Defendants likely would have argued against class certification. While Lead Counsel are confident that all of the Rule 23 requirements would have been met, and that the Court would have certified the proposed class, Lead Plaintiffs bear the burden of proof on class certification, and Defendants would have undoubtedly raised arguments challenging the propriety of class certification, including with respect to market efficiency.

33.    Lead Plaintiffs anticipate that Defendants would have argued that DouYu's market for its ADS was not efficient as it was a foreign company with a small market capitalization. While Lead Plaintiffs believe they had the better argument on this issue, they are aware that class certification was not a forgone conclusion.

34.    Moreover, even if Lead Plaintiffs successfully obtained class certification, Defendants could have sought permission from the Third Circuit to appeal any class certification order under Federal Rule of Civil Procedure 23(f), further delaying or precluding any potential recovery. Likewise, even if a class were certified, it would be subject to potential decertification risks. Class certification was, by no means, a forgone conclusion.

## B.    Challenges to Obtaining Discovery

35.    Lead Plaintiffs would have encountered significant obstacles to obtaining the evidence required to prove their claims, virtually all of which was located in China.

36.    The challenges posed by the fact that key documents and witnesses were located abroad were not merely theoretical. There are substantial challenges, expenses, and risks to obtaining international discovery. To obtain documents and take depositions outside the U.S., Lead Plaintiffs would have to follow appropriate international conventions and/or apply to this Court for letters rogatory. This would be an extremely time-consuming process, and there is no guarantee it would be successful.

37.    Before any documents could be produced to Lead Plaintiffs, DouYu's counsel would have to review the documents, send them to the appropriate authorities in the Chinese government, and wait for permission to approve their release. Lead Counsel has been, and currently are, involved in litigation with China-based defendants in which discovery has been significantly stalled by this process. For instance, in *In re Didi Global Inc. Securities Litigation,* Case No. 1:21-cv-05807 (S.D.N.Y.) and *In re NIO, Inc. Securities Litigation*, Case No. 1:19-cv-01424 (E.D.N.Y.) there have been numerous discovery disputes including defendants asserting that producing documents would be in contravention of Chinese law. For

14

several reasons, plaintiffs in both of those cases have been forced to bring multiple motions to compel.

38. To the extent Lead Plaintiffs obtained documents, the vast majority of the key documents would be written in Chinese. Prosecution of the Action would require a team of attorneys who are fluent in Chinese, and review of the documents would be protracted and expensive. It would also involve the review and translation of many more documents than what would ultimately be offered as evidence at trial. Additionally, translation accuracy can be contentious because a word or phrase may have multiple meanings or a different context-specific meaning, which can lead to evidentiary disputes and increased cost.

39. Obtaining deposition testimony would also have proven extremely difficult and costly. Although there are cumbersome official approval procedures in China that could theoretically be used to request a deposition, it is Lead Counsel's understanding that very few such requests have been granted in recent decades. The probability of Lead Plaintiffs being able to examine third parties in this case was, therefore, almost non-existent.

40. Moreover, to the extent depositions do take place in cases with Chinese defendants, it is Lead Counsel's experience that they are almost always conducted in another jurisdiction outside of mainland China, such as Hong Kong or Singapore. This is a costly and drawn-out endeavor, involving international flights and hotels,

many hours of travel time, significant time changes, and the depositions themselves are more time-consuming and expensive given the need for a main interpreter and check interpreters.

### C.      Risks to Proving Liability

41.      While Lead Plaintiffs believe their claims to be meritorious, they also recognize that Defendants have potentially viable defenses, including arguments cutting against falsity and scienter. For example, in its pre-motion to dismiss the SAC letter, DouYu asserted that Lead Plaintiffs did not plead actionable misstatements because DouYu "disclosed the exact risks that Plaintiffs claim were omitted" and that the Company "did promptly and adequately disclose the regulatory inspection." ECF No. 51 at 2. Similarly, DouYu argued that Lead Plaintiffs failed to allege that Defendants acted with scienter and generalized allegations, such as that "DouYu sought to 'revitalize dwindling revenue' by resorting to 'practices such as gambling and pornography, [which are] prohibited by Chinese law'" are insufficient. *See id.* at 3.

42.      Lead Plaintiffs believe that they met their burden to plead falsity and scienter, but recognize that success was not guarantee. Scienter in particular is notoriously a difficult element to satisfy. *See e.g., In re Lucent Techs., Inc., Sec. Litig.*, 307 F. Supp. 2d 633, 645 (D.N.J. 2004) (proving liability, particularly

16

scienter, "would have been very difficult" and based on risks and contingencies, settlement is reasonable given risks involved in establishing liability).

### D.    Risks to Proving Loss Causation and Damages

43.    Assuming Lead Plaintiffs overcame the above risks and established Defendant's liability, Lead Plaintiffs would have confronted challenges in establishing loss causation and class wide damages. While Lead Plaintiffs would have argued that the declines in the price of DouYu ADS were attributable to corrections of the alleged misstatements and omissions, Defendants would have asserted that none of the disclosures Lead Plaintiffs alleged are sufficiently causal or sufficiently corrective of any alleged fraud to adequately plead or prove loss causation.

44.    The SAC alleged multiple corrective disclosures associated with several drops in the price of DouYu ADS, and Lead Plaintiffs would have had to prove causation for each alleged corrective disclosure.  Significant risks remained as to whether, and to what extent, Lead Plaintiffs would be able to prevail in proving that each of the alleged price drops were, in fact, caused by revelations of Defendants' allegedly fraudulent conduct.

45.    If Defendants prevailed on several, or all, of their loss causation arguments, potential class wide damages would have been reduced significantly or even eliminated.

17

46.    Moreover, in order to prove their claims, Lead Plaintiffs would have had to proffer expert testimony demonstrating, among other things: (a) what the true value of DouYu ADS would have been had there been no alleged misstatements or omissions; (b) the amount by which the value of DouYu ADS was inflated by the alleged material misstatements and omissions; and (c) the amount of artificial inflation removed by each of the alleged corrective disclosures, including disaggregating any impact of potential non-fraud-related news, if any. Such expert testimony is expensive and subject to rebuttal.

47.    Indeed, Defendants almost certainly would have presented their own damages expert(s), who would have no doubt presented conflicting conclusions and theories for DouYu ADS price declines on the alleged disclosure dates. Defendants likely would have challenged Lead Plaintiffs' expert(s) at the class certification stage, summary judgment, with *Daubert* motions, and at trial and appeal. This "battle of the experts" creates an additional litigation risk because the reaction of a trier of fact to such expert testimony is highly unpredictable, creating uncertainty regarding how much weight a judge or jury will accord the analysis of Defendants' competing experts.

18

**E.**     **Other Risks, Including Trial, Appeals, and Ability to Collect a Judgment**

**1. Risks of Litigation Against China-Based Defendants**

48.     Even if Lead Plaintiffs succeeded in obtaining a favorable judgment at trial, it may be a pyrrhic victory. Enforcing a U.S. judgment in China is nearly impossible as the U.S. Department of State has noted that "[t]here is no bilateral treaty or multilateral convention in force between the United States and any other country on reciprocal recognition and enforcement of judgments."[4] Although the international community is attempting to create consistency in reciprocity among foreign counties, progress between the United States and China has not occurred. Although not yet in effect, the 2019 Hague Convention on the Recognition and Enforcement of Foreign Judgments in Civil or Commercial Matters ("Hague Judgment Convention"), is designed to facilitate the enforceability of judgments among contracting parties.[5] The Hague Judgment Convention's stated goal is "to promote effective access to justice for all and to facilitate rule-based multilateral trade and investment, and mobility, through judicial co-operation." *Id*. Even if it were operative, the Hague Judgment Convention would not be helpful here as the United States is a signatory, but China is not. *Id*.

---

[4]   https://travel.state.gov/content/travel/en/legal/travel-legal-considerations/internl-judicial-asst/Enforcement-of-Judgements.html (last accessed July 14, 2025).

[5] https://www.hcch.net/en/instruments/conventions/full-text/?cid=137 (last accessed July 14, 2025).

49.    Moreover, China regularly denies recognition and enforcement of foreign judgments, including from the United States, based on reciprocity or public policy. *See* Shun-Hsiang Chen, *Signed, Sealed, & Undelivered: Unsuccessful Attempts of Foreign Judgment Recognition Between the U.S. and China*, 16 Brook. J. Corp. Fin. & Com. L. 167 (2022). As China does not have an agreement with the United States, enforcement of United States judgments would fall within the parameters of reciprocity. However, "China's reciprocity system is considered one of the most restrictive in the world and regularly utilized to deny foreign judgment recognition and enforcement." *Id.* at 184. As of June 2022, Chinese courts had only recognized and enforced two judgments from the United States, *id.*, neither of which were judgments from securities lawsuits.

50.    Lead Counsel have, unfortunately, dealt with this situation. GPM and RLF, as co-lead counsel in another case against Chinese defendants obtained a default judgment against the corporate defendants and one individual defendant in the amount of $227,875,000. *In re Puda Coal Securities Inc. et a. Litig.*, No. 1:11-cv-2598-DLC, ECF Nos. 654, 669 (S.D.N.Y. February 8, 2017 and May 10, 2017). Despite efforts in China to enforce the judgment against an insurance policy, purportedly covering the judgment and issued by a Chinese insurance company, GPM and RLF were never able to collect on the judgment.

20

51.     Besides the lack of enforceability of a judgment, the risk that DouYu would disengage with this litigation loomed large. Although DouYu (and eventually all Defendants) retained counsel based in the United States, there was no guarantee that they would remain in the litigation. If this were to happen, DouYu investors would most likely recover nothing.

52.     As previously discussed with preliminary approval, RLF experienced this first-hand in *Vanderhoef v. China Auto Logistics, Inc.*, No. 2:18-cv-10174-CCC-ESK (D.N.J.), a case involving China Auto Logistics, Inc. ("CALI"), a Nevada corporation with headquarters in China and China-based individual defendants. Originally, CALI was represented by K&L Gates LLP and the China-based individual defendants had their own counsel. Prior to a decision on CALI's motion to dismiss, plaintiffs and CALI engaged in court ordered mediation over two days. As settlement efforts were unsuccessful, CALI's motion was reinstated. The court then denied CALI's and the China-based individual defendants' motions to dismiss. Before CALI's deadline to file an answer, its counsel requested to withdraw from the action as CALI had not paid its attorneys for almost a year. The China-based individual defendants filed an answer, but soon after their attorneys also withdrew as those defendants stopped engaging meaningfully with their counsel and failed to pay their attorneys. In the end, the plaintiffs were forced to voluntarily dismiss their claims against CALI and the China-based individual defendants without prejudice

21

as they did not retain new counsel and ultimately vanished. *See* ECF No. 62-5 (letter from plaintiffs outlining history of events and grounds for dismissal).

53.     Although eventually reaching a settlement, a similar occurrence happened in *Chen v. Missfresh Limited, et al.*, No. 1:22-cv-09836-JSR (S.D.N.Y.). In *Missfresh*, the parties reached a settlement, however, it was stalled when Missfresh's original counsel withdrew because the company was not paying them and Missfresh determined it was unable to fund a settlement under the initial agreement in principle to settle the action. Fortunately, new counsel was retained and a settlement was reached, but not without great uncertainty.

54.     Similarly, in *In re ChinaCast Education Corporation Sec. Litig.*, No. 2:12cv-04621-JFW-PLA (C.D.Cal.), plaintiffs diligently pursued a securities class action for about six years against ChinaCast Education Corporation, a Delaware company operating in China. The effort included a successful appeal at the Ninth Circuit, which reversed the district court's dismissal decision. ChinaCast's insurers refused to cover litigation costs, however, and the company's counsel withdrew from the action leaving ChinaCast unrepresented. The plaintiffs later secured a default judgment of $65.8 million for the class, but the very next day, ChinaCast filed for bankruptcy. In an attempt to recover the default judgment, plaintiffs spent an additional two years pursuing a lawsuit against ChinaCast's multiple insurers. *See Jayhawk Private Equity Fund II LP v. Liberty Insurance Underwriters*, 2:17-cv-

05523-GW-RAO (C.D.Cal.). Unfortunately, plaintiffs' claims were dismissed due to the expansive exclusion provisions in the insurance policies. Therefore, despite approximately eight years of dedicated efforts by the plaintiffs' counsel, there was no financial recovery for the investors from the China-based defendant.

55.    Another risk for continuing litigation present here is the fact that that DouYu is a variable interest entity ("VIE"). In a VIE, the U.S.-listed company (here, a Cayman Islands corporation) has a contractual interest in a Chinese company, but does not actually have any ownership or equity interest the Chinese company. In an Investor Bulletin entitled, "U.S.-Listed Companies Operating Chinese Businesses Through a VIE Structure," the SEC warned that "***If the parties to these contracts do not meet their obligations as intended or there are effects on the enforceability of these arrangements from changes in Chinese law or practice, the U.S.-listed company may lose control over the China-based company, and investments in its securities may suffer significant economic losses.***" (emphasis in original).[6]

---

[6] https://www.investor.gov/introduction-investing/general-resources/news-alerts/alerts-bulletins/investor-bulletins/investor-bulletin-us-listed-companies-operating-chinese-businesses-through-vie-structure (last accessed July 14, 2025).

23

## 2. Other Risks in Protracted Litigation

56.     Without the added complication of litigation against a Chinese issuer, Lead Plaintiffs would have had to prevail at several stages of litigation, each of which would have presented significant risks in complex class actions such as this one. Lead Counsel know from experience that despite the most vigorous and competent efforts, success in complex litigation such as this case is never assured. In fact, GPM lost a six-week antitrust jury trial in the Northern District of California after five years of litigation, which included many overseas depositions, the expenditure of millions of dollars of attorney and paralegal time, and the expenditure of more than a million dollars in hard costs. *See In re: Korean Ramen Antitrust Litigation*, Case No. 3:13-cv-04115 (N.D. Cal.). Complex litigation is uncertain, and success in cases like this one is never guaranteed.

57.     Even if Lead Plaintiffs succeeded in proving all elements of their case at trial and obtained a jury verdict, Defendants would almost certainly have appealed. An appeal not only would have renewed the risks faced by Lead Plaintiffs—as Defendants would have reasserted their arguments summarized above—but also would have resulted in significant additional delay.

58.     Given these significant litigation risks, Lead Plaintiffs and Lead Counsel believe the Settlement represents a favorable result for the Settlement Class

particularly as the Settlement is a guaranteed recovery for DouYu investors. In fact, the Settlement Amount is already funded in an escrow account.

### F.    The Settlement is Reasonable in Light of Potential Recovery in the Action

59.    In addition to the attendant risks of litigation discussed above, the Settlement is also fair and reasonable in light of the potential recovery of available damages. If Lead Plaintiffs had fully prevailed in each of their claims at all stages of litigation including summary judgment and after a jury trial, if the Court certified the same class period as the Settlement Class Period, and if the Court and jury accepted Lead Plaintiffs' damages theory in full, including proof of loss causation as to the entirety of the share price drops alleged in this case—*i.e.*, Lead Plaintiffs' ***best-case*** scenario—estimated total ***maximum*** damages are approximately $9.2 million, resulting a percentage recovery of approximately 24.5%.

60.    Such a recovery compares favorably with those in similar complex class litigation. *See* Ex. 6 (NERA Report, at 26 (Fig. 23), 27 (Fig. 24)) (between January 2015-December 2024 the median of settlement value as a percentage of "NERA-Defined Investor Losses" was 24% for securities class actions with estimated losses under $20 million, and 1.2% for all securities class actions in 2024).

## IV. LEAD PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF THE NOTICE

61.    The Preliminary Approval Order (ECF No. 79) directed that the Notice detailing key information regarding the proposed Settlement be disseminated to the Settlement Class. The Preliminary Approval Order also set a deadline of July 28, 2025 (21 calendar days prior to the final fairness hearing) for Settlement Class Members to submit objections to the Settlement, the Plan of Allocation, and/or the Fee Memorandum or to request exclusion from the Settlement Class and set a final fairness hearing date of August 18, 2025 at  (the "Settlement Hearing").

62.    Pursuant to the Preliminary Approval Order, Lead Counsel instructed SCS, the Court-approved Claims Administrator, to disseminate the Notice and to publish the Summary Notice. Contemporaneously with mailing and emailing of the Notice, Lead Counsel instructed SCS to post downloadable copies of the Notice and Proof of Claim and Release Form (the "Claim Form" and, together with the Notice, the "Notice Packet") online at https://www.strategicclaims.net/DouYu (the "Settlement Website"). Upon request, SCS mailed copies of the Notice and/or Claim Form to Settlement Class Members and will continue to do so until the deadline to submit a Claim Form has passed.

63.    The Notice directed Settlement Class Members to the Settlement Website to obtain additional information on the Settlement, including how to file a

26

claim and access to downloadable versions of the Notice and Claim Form. The Notice contains, among other things, a description of the Action; the definition of the Settlement Class; a summary of the terms of the Settlement and the proposed Plan of Allocation; and a description of a Settlement Class Member's right to participate in the Settlement, object to the Settlement, the Plan of Allocation and/or the Fee Memorandum, or to exclude themselves from the Settlement Class. The Notice also informed Settlement Class Members of Lead Counsel's intent to apply for an award of attorneys' fees in an amount not to exceed 33⅓% of the Settlement Fund, and for reimbursement of out-of-pocket expenses in an amount not to exceed $60,000, and an application for reimbursement of the reasonable costs and expenses incurred by Lead Plaintiffs related to their representation of the Settlement Class of up to $40,000.

64.    To disseminate the Notice, SCS obtained from DouYu the name and address of one entity that purchased or held DouYu ADS during the Settlement Class Period. *See* Declaration of Sarah Evans Concerning: (A) Emailing and Mailing of Notice; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion and Objections (the "Evans Decl."), attached hereto as Ex. 1, at ¶4.

65.    In addition, SCS maintains a database with names and addresses of the largest and most common banks, brokers, and other nominees (the "Nominee

Database"), which identified 2,467 mailing records for potential Settlement Class Members. Evans Decl. at ¶5.

66. SCS sent a letter to those on the Nominee Database directing that within ten (10) calendar days of receipt of the letter, the nominees either: (a) request from SCS sufficient copies of the Postcard Notice to forward to all such beneficial purchasers/owners and, within ten (10) calendar days of receipt of those Postcard Notices, forward them to all such beneficial purchasers/owners; (b) request from SCS a link to the electronic Long Notice and Proof of Claim and, within ten (10) calendar days of receipt of the link from SCS, email the link to all such beneficial owners for whom valid email addresses are available; or (c) send a list of the names, mailing addresses and email addresses (to the extent known) of all such beneficial owners to SCS. Evans Decl. at ¶5.

67. Through July 11, 2025, the date the Evans Declaration was executed, 35,372 potential Settlement Class Members were directly notified of the Settlement by either mailed Postcard Notice or emailed links to the Long Notice and Proof of Claim Form. Evans Decl. at ¶8.

68. On May 9, 2025, in accordance with the Preliminary Approval Order, SCS caused the Summary Notice to be transmitted once over *GlobeNewswire*. Evans Decl. at ¶10; Ex. 1-D (publication confirmations).

69. SCS also established a Settlement Website, www.strategicclaims.net/DouYu/. The Settlement Website: lists important case deadlines; provides downloadable copies of the Long Notice, Proof of Claim, Stipulation, Preliminary Approval Order; and provides for the electronic submission of claims. Evans Decl. at ¶12. SCS also maintains a toll-free number for the Settlement. *Id.*, at ¶11.

70. The deadline for Settlement Class Members to object to the Settlement, Plan of Allocation, and/or to the request for attorneys' fees, reimbursement of litigation expenses, and PSLRA awards to Lead Plaintiffs or to request exclusion from the Settlement Class is July 28, 2025. To date, no requests for exclusion have been received. Evans Decl. at ¶13.

71. One individual emailed SCS stating, in part, "I also want to express my disagreement with the settlement amount[,] it's way too little versus the impact but I don't know how to proceed and time is running out." Evans Decl. at ¶14; Ex. 1-E. SCS promptly responded to this individual to explain the process of lodging a formal objection, should this individual chose to do so. *Id.*

72. To date, no objections have been filed with the Court or received by counsel.

29

## V.    ALLOCATION OF THE NET PROCEEDS OF THE SETTLEMENT

73.    Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all Settlement Class Members who want to participate in the distribution of the Net Settlement Fund (*i.e.*, the $2,250,000 Settlement Amount, plus interest earned thereon, less: (i) any Taxes; (ii) any Notice and Administration Costs; (iii) any Litigation Expenses awarded by the Court; and (iv) any attorneys' fees awarded by the Court) must submit a valid Claim Form with all required information either online or postmarked no later than July 21, 2025. The Net Settlement Fund will be distributed among Authorized Claimants according to the proposed Plan of Allocation, subject to Court approval. *See* Ex. 1-A (Notice) at pg. 5-7.

74.    The proposed Plan of Allocation is detailed in the Notice. *See id*. The Notice is posted online at the Settlement Website, is downloadable, and upon request, will be mailed to any potential Settlement Class Member. The Plan of Allocation's objective is to equitably distribute the Net Settlement Fund to those Settlement Class Members who suffered economic loss as a result of the alleged wrongdoing, as opposed to losses caused by market or industry-wide factors or Company-specific factors unrelated to the alleged wrongdoing and takes into consideration when each Authorized Claimant purchased and/or sold DouYu ADS. *See id*.

75.     As described in the Notice, calculations under the Plan of Allocation are not intended to be estimates of, nor indicative of, the amounts that Settlement Class Members might have been able to recover after a trial or estimates of the amounts that will be paid to Authorized Claimants pursuant to the Settlement. Rather, the calculations under the Plan of Allocation are a method to weigh the claims of Settlement Class Members against one another for the purposes of making an equitable allocation of the Net Settlement Fund.

76.     The Plan of Allocation is based on an out-of-pocket theory of damages consistent with Section 10(b) of the Exchange Act, and reflects an assessment of the damages that Plaintiffs contend could have been recovered under the theories of liability and damages asserted in the Action. More specifically, the Plan of Allocation reflects, and is based on, Lead Plaintiffs' allegation that the price of DouYu ADS was artificially inflated during the Settlement Class Period due to Defendants' alleged materially false and misleading statements and omissions.

77.     Under the proposed Plan of Allocation, each Authorized Claimant will receive his, her, or its *pro rata* share of the Net Settlement Fund. Specifically, an Authorized Claimant's *pro rata* share shall be the Authorized Claimant's Recognized Claim divided by the total of Recognized Claims of all Authorized Claimants, multiplied by the total amount in the Net Settlement Fund.

78.     An individual Claimant's recovery under the Plan of Allocation will depend on several factors, including the number of valid claims filed by other Claimants and how many shares of DouYu ADS the Claimant purchased, acquired, or sold during the Settlement Class Period and when that Claimant bought, acquired, or sold the ADS. If a Claimant has an overall market gain with respect to his, her, or its overall transactions in DouYu ADS during the Settlement Class Period, or if the Claimant purchased shares during the Settlement Class Period, but did not hold any of those shares through the alleged corrective disclosures, the Claimant's recovery under the Plan of Allocation will be zero, as any loss suffered would not have been caused by the revelation of the alleged fraud.

79.     If the prorated payment to be distributed to any Authorized Claimant is less than $10.00, no distribution will be made to that Authorized Claimant. Ex. 1-A at 5. Any prorated amounts of less than $10.00 will be included in the pool distributed to those Authorized Claimants whose prorated payments are $10.00 or greater. In Lead Counsel's experience, processing and sending a check for less than $10.00 is cost prohibitive.[7]

---

[7] If any funds remain after an initial distribution to Authorized Claimants, as a result of uncashed or returned checks or other reasons, subsequent distributions will be conducted as long as they are cost effective.  Ex. 1-A (Notice) at 5.  At such time as it is determined that the re-distribution of funds remaining in the Net Settlement Fund is not cost-effective, the remaining balance shall be contributed to a non-profit organization selected by Lead Counsel, and approved by the Court.

80.    In sum, the Plan of Allocation was designed to allocate the proceeds of the Net Settlement Fund among Settlement Class Members based on the losses they suffered on transactions in DouYu ADSs that were attributable to the conduct alleged in the SAC. Accordingly, Lead Counsel respectfully submit that the Plan of Allocation is fair and reasonable and should be approved by the Court.

81.    To date, no objections to the proposed Plan of Allocation have been received or filed on the Court's docket.

## VI.    <u>LEAD COUNSEL'S REQUEST FOR ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES</u>

82.    In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel are applying for a fee award of 33⅓% of the Settlement Fund (or $750,000), plus interest earned at the same rate as the Settlement Fund. Lead Counsel also request reimbursement of Litigation Expenses from the Settlement Fund in the amount of $63,270.97, which includes $53,270.97 in out-of-pocket expenses that Lead Counsel incurred in connection with the prosecution of the Action and $5,000 to each Lead Plaintiff (for a total of $10,000) for their reasonable costs directly incurred in connection with their representation of the Settlement Class. The total Litigation Expenses of $63,270.97, is well below the maximum expense amount of $100,000 set forth in the Notice of $60,000 for out-of-pocket expenses and $40,000 for payments to Lead Plaintiffs. The legal authorities supporting a 33⅓% fee award are set forth in the accompanying Fee

Memorandum, filed contemporaneously herewith. The primary factual bases for the requested fee and reimbursement of Litigation Expenses are summarized below.

83.   Attached hereto as Exhibits 2 and 3 are declarations from GPM and RLF, respectively, in support of the request for an award of attorneys' fees and reimbursement of litigation expenses. Through the declarations, each firm is reporting its own attorneys' time and rates. The below chart summarizes GPM's and RLF's lodestar information, by firm, listing the total reported hours, corresponding lodestar amounts, and litigation expenses, based on data provided in each firm's declaration (*see* Exs. 2-3).[8]

| Firm | Hours | Lodestar | Expenses |
|---|---|---|---|
| Glancy Prongay & Murray LLP | 248.5 | $254,853.00 | $24,841.99 |
| The Rosen Law Firm, P.A. | 421.4 | $441,480.00 | $28,428.98 |
| **Total:** | 669.9 | $696,333.00 | $53,270.97 |

---

[8] Lead Counsel will continue to perform legal work on behalf of the Settlement Class should the Court finally approve the proposed Settlement. Additional resources will be expended assisting Settlement Class Members with their Claim Forms and related inquiries and working with the Claims Administrator, SCS, to ensure the smooth progression of claims processing. Lead Counsel will also apply to the Court for a Distribution Order upon completion of claims processing.

A.    **The Fee Application**

84.    Lead Counsel are applying for a percentage-of-the-common-fund fee award to compensate them for the services they rendered on behalf of the Settlement Class. As set forth in the accompanying Fee Memorandum, the percentage method is the best method for determining a fair attorneys' fee award, because unlike the lodestar method, it aligns the lawyers' interest with that of the Settlement Class in achieving the maximum recovery. The lawyers are motivated to achieve maximum recovery in the shortest amount of time required under the circumstances. This paradigm minimizes unnecessary drain on the Court's resources. Notably, the percentage-of-the-fund method has been recognized as appropriate by the Supreme Court and the Third Circuit for cases of this nature. *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 306 (3d Cir. 2005), as amended (Feb. 25, 2005) ("we reiterate that the percentage of common fund approach is the proper method of awarding attorneys' fees"). Furthermore, as set forth below, though not required in the Third Circuit, Lead Counsel also respectfully submits that the requested fee is fully supported by a lodestar multiplier cross-check. *See id.* at 307 ("Lodestar multipliers are relevant to the abuse of discretion analysis. But the lodestar cross-check does not trump the primary reliance on the percentage of common fund method.").

85.    Based on the quality of the result achieved, the extent and quality of the work performed, the significant risks of the litigation, and the fully contingent nature

of the representation, Lead Counsel respectfully submit that the requested fee award is fair and reasonable and should be approved. As discussed in the Fee Memorandum, a 33⅓% fee award is well within the range of percentages awarded in securities class actions with comparable settlements in this Circuit.

**1.    The Excellent Outcome Achieved is the Result of Significant Time and Labor That Lead Counsel Devoted to the Action**

86.    As set forth more fully in the attached fee and expense declarations of GPM and RLF (Exs. 2-A and 3-A, respectively), Lead Counsel have expended a total of 669.9 hours in the investigation and prosecution of the Action through and including July 10, 2025. The resulting total lodestar is $696,333.00. The requested fee amount of 33⅓% of the Settlement Fund equals $750,000 (plus interest earned at the same rate as the Settlement Fund), and therefore represents a 1.08 multiplier of Lead Counsel's lodestar. This request is reasonable when viewing the range of fee multipliers typically awarded in comparable securities class action and in other class actions involving significant contingency fee risk, in this Circuit and elsewhere.

87.    The hourly rates for the attorneys and professional support staff are similar to the rates that have been accepted in other securities or shareholder litigation. Additionally, the rates billed by Lead Counsel for the attorneys who worked on this Action ($550-$975 per hour for non-partners and $1,050-$1,400 per hour for partners) are comparable to peer plaintiff and defense firms litigating

36

matters of similar magnitude. *See* Ex. 8 attached hereto (table of peer law firm billing rates).

88.    Moreover, in addition to drafting the motion for final approval, Lead Counsel will continue to work towards effectuating the Settlement in the event the Court grants final approval. Among other things, Lead Counsel will continue working with the Claims Administrator to resolve issues with Settlement Class Member claims, will respond to shareholder inquiries, will draft and file a motion for distribution, and will oversee the distribution process. No additional compensation will be sought for this work.

### 2.    The Magnitude and Complexity of the Action

89.    As detailed in the Fee Memorandum, securities class action cases are known for their notorious complexity. This case was no different. As detailed above, this Action presented numerous complex issues, including the need for Lead Counsel to understand, among other things Chinese regulations and the alleged wrongdoing underlying Defendants' conduct. The complexities were especially acute given the case's transnational posture; it involved foreign parties and witnesses, foreign-language documents, and a dispute premised on conduct that occurred outside of the United States.

### 3.      The Significant Risks Borne by Lead Counsel

90.      This prosecution was undertaken by Lead Counsel on an entirely fully contingent basis. From the outset, this Action was a highly uncertain securities case. There was no guarantee that Lead Counsel would ever be compensated for the substantial investment of time and money the case would require. In undertaking that responsibility, Lead Counsel were obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, that funds were available to compensate attorneys and staff, and that the considerable litigation costs required by a case like this one were covered. With an average lag time of many years for complex cases like this to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis. Indeed, Lead Counsel received no compensation during the course of the Action and incurred $53,270.97 in out-of-pocket litigation-related expenses in prosecuting the Action.

91.      Additionally, Lead Counsel developed and alleged Plaintiffs' Exchange Act claims without information gained through subpoena power, hindered by the PSLRA's automatic discovery stay.

92.      Moreover, despite the most vigorous and competent of efforts, success in contingent-fee litigation like this one is never assured. Lead Counsel know from experience that the commencement of a class action does not guarantee a settlement. On the contrary, it takes hard work and diligence by skilled counsel to develop the

38

facts and theories that are needed to sustain a complaint or win at trial, or to induce sophisticated defendants to engage in serious settlement negotiations at meaningful levels.

> **4.    The Quality of Representation, Including the Result Obtained, the Experience and Expertise of Lead Counsel, and the Standing and Caliber of Defendants' Counsel**

93.    As demonstrated by Lead Counsel's firm résumés, attached hereto as Exs. 2-C (GPM) and 3-C (RLF), Lead Counsel are highly experienced and skilled law firms that focus their practices on securities class action and other complex commercial litigation. Indeed, Lead Counsel have substantial experience in litigating securities fraud class actions that have been appointed to serve as lead counsel by courts throughout the country. Additionally, Lead Counsel enjoy a well-deserved reputation for skill and success in the prosecution and resolution of securities class actions against Chinese issuers, which added valuable leverage in the settlement negotiations.

94.    Moreover, the quality of the work performed by Lead Counsel in obtaining the Settlement should also be evaluated in light of the quality of the opposition. Here, Defendants were represented by Davis Polk & Wardwell LLP and Gibbons P.C., two highly experienced law firms with knowledgeable securities class action practitioners. Defense Counsel vigorously represented their clients' interests throughout this Action. In the face of this experienced and formidable opposition,

Lead Counsel were able to develop a case that was sufficiently strong to nonetheless persuade Defendants to settle the case on terms that were highly favorable to the Settlement Class.

### 5.    The Requested Fee in Relation to the Settlement

95.    The amount of the fee requested (33⅓%) in relation to the Settlement Amount ($2,250,000) is fair and reasonable. Courts routinely award fees of 33⅓% in securities class action settlements. *See* Ex. 7 hereto (chart compiling common fund settlements within the Third Circuit awarding attorneys' fees of 33% or higher).

### 6.    The Reaction of the Settlement Class Supports Lead Counsel's Fee Request

96.    As noted above, as of July 11, 2025, a total of 35,372 Postcard Notices were mailed, or links to the Long Notice and Proof of Claim Form were emailed, to potential Settlement Class Members informing them that Lead Counsel would apply for an award of attorneys' fees in an amount not to exceed 33⅓% of the Settlement Fund. Evans Mailing Decl. ¶8; Ex. 1-A (Notice) at 1, 9; Ex. 1-B. To date, no objections to the maximum potential attorneys' fees request set forth in the Notice have been received or entered on this Court's docket. Any objection received after the date of this filing will be addressed in Lead Counsel's reply papers, which are to be filed by August 11, 2025.

40

### 7.    Lead Plaintiffs Support Lead Counsel's Fee Request

97.    As set forth in their concurrently filed declarations, Lead Plaintiffs support the requested fee as fair and reasonable based on the work performed, the recovery obtained for the Settlement Class, and the risks of the Action. *See* Ex. 4 (Seiler Declaration), ¶¶9-10; and Ex. 5 (Reyes Declaration), ¶¶9-10. Lead Plaintiffs endorsement of Lead Counsel's fee request supports the reasonableness of the request and should be given weight in the Court's consideration of the fee award.

98.    In sum, Lead Counsel accepted this case on a fully contingent basis, committed significant resources to it, and prosecuted the Action without any compensation or guarantee of success. Based on the result obtained, the quality of the work performed, the risks of the Action, and the contingent nature of the representation, Lead Counsel respectfully submit that a fee award of 33⅓%, resulting in a multiplier of 1.08, is fair and reasonable, and is supported by the fee awards courts have granted in other comparable cases.

### B.    <u>The Requested Litigation Expenses Reimbursement is Fair and Reasonable</u>

99.    Lead Counsel respectfully request reimbursement of the $53,270.97 in out-of-pocket expenses that were reasonably and necessarily incurred in connection with commencing, litigating, and settling the claims asserted in the Action.

100.    Lead Counsel's expenses are detailed in the concurrently filed fee and expense declarations, attached as Ex. 2-B (GPM) and Ex. 3-B (RLF). The Notice

41

informed potential Settlement Class Members that Lead Counsel would be seeking reimbursement of such expenses in an amount not to exceed $60,000. Ex. 1-A (Notice) at 1, 9. The total amount Lead Counsel requests thus falls below the maximum amount that Settlement Class Members were advised could be sought. To date, no objection has been raised as to the maximum amount of expenses set forth in the Notice. If any objection to the request for reimbursement of out-of-pocket expenses is made after the date of this filing, Lead Counsel will address it in their reply papers.

101.    From the beginning of the case, Lead Counsel were aware that they might not recover their out-of-pocket expenses. Lead Counsel also understood that, even assuming the case was ultimately successful, reimbursement for expenses would not compensate them for the contemporaneous lost use of funds advanced to prosecute this Action. Accordingly, Lead Counsel were motivated to, and did, take steps to assure that only necessary expenses were incurred for the vigorous and efficient prosecution of the case.

102.    The litigation expenses for which Lead Counsel seek reimbursement are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour. These expenses include, among other things, expert fees, investigator fees, court fees, service of process costs, cost of publishing

42

press releases as required by the PSLRA, translations, postage and delivery expenses, and the cost of online legal research.

103.    Finally, as stated above, Lead Plaintiffs seek reimbursement, pursuant to 15 U.S.C. § 78u-4(a)(4), of their reasonable costs directly incurred in connection with their representation of the Settlement Class, in the total amount of $10,000. *See* Seiler Declaration, ¶13; Reyes Declaration, ¶13. The Notice alerted potential Settlement Class Members that Lead Plaintiffs would seek up to $40,000 in total. Ex. 1-A at 1, 9. Thus, the requested service awards are well below the maximum amount set forth in the Notice.

104.    Lead Plaintiffs worked closely with Lead Counsel throughout the pendency of this Action in connection with their service as Lead Plaintiffs. For example, Lead Plaintiffs: (a) regularly communicated with Lead Counsel regarding the posture and progress of the case; (b) compiled and produced their trading to Lead Counsel; (c) moved to be appointed Lead Plaintiffs in the Action; (d) reviewed all significant pleadings filed in the Action; (e) reviewed Court orders and discussed them with Lead Counsel; (f) discussed settlement strategy; (g) evaluated the Settlement Amount, conferred with Lead Counsel, and ultimately approved the Settlement; and (h) communicated with Lead Counsel regarding finalizing the Settlement. *See* Exs. 4-5.

43

105.  To date, no objections to the Litigation Expenses has been filed on the Court's docket. The Litigation Expenses incurred by Lead Counsel and Lead Plaintiffs were reasonable and necessary to represent the Settlement Class and achieve the Settlement. Accordingly, Lead Counsel respectfully submit that the Litigation Expenses should be reimbursed in full from the Settlement Fund.

## VII.   CONCLUSION

106.  In view of the significant recovery for the Settlement Class and the substantial risks of this Action, as described herein and in the accompanying Final Approval Memorandum, we respectfully submit that the Settlement should be approved as fair, reasonable, and adequate and the proposed Plan of Allocation should be approved as fair and reasonable. We further submit that the requested fee in the amount of 33⅓% of the Settlement Fund should be approved as fair and reasonable, and the request for reimbursement of $53,270.97 in out-of-pocket litigation expenses, and PSLRA payments in the amount of $5,000 to each Lead Plaintiff should also be approved.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this, the 14th day of July 2025, in New York, New York.

*/s/ Phillip Kim*
Phillip Kim

44

45

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this, the 14th day of July 2025, in Los Angeles, California.

*/s/ Casey E. Sadler*
Casey E. Sadler